## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

DILIP MEHTA, M.D.,

      Plaintiff,

vs.                                      CASE NO.  8:05-CV-27-T24-TGW

HCA HEALTH SERVICES OF FLORIDA, INC.,
d/b/a HCA OAK HILL HOSPITAL,

      Defendant.

_____/

### PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Plaintiff Dilip Mehta, M.D., by and through its undersigned counsel, opposes Defendant's Motion to Dismiss the First Amended Complaint.

### STANDARD OF REVIEW

When deciding a motion to dismiss, the Court must accept all well-pleaded allegations as true and draw all reasonable inferences in favor of the pleader. *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984). A complaint should not be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957).

### ARGUMENT

**I.**     **The Defendant has failed to prove that Plaintiff can prove no set of facts establishing that he was a Hospital employee for purposes of Title VII and the Florida Civil Rights Act.**

    **A.**     **The Eleventh Circuit Standard**

The Eleventh Circuit "has adopted the 'economic realities' test to determine whether a Title VII plaintiff is an employee." *Cuddeback v. Florida Board of Education,* 381 F.3d 1230, 1234 (11th

Cir. 2004).  "Under this test, the term 'employee' is 'construed in light of general common law concepts' and 'should take into account the economic realities of the situation,' 'viewed in light of the common law principles of agency and the right of the employer to control the employee.'"  *Id., quoting Cobb v. Sun Papers, Inc.,* 673 F.2d 337, 340-41 (11th Cir. 1982).  "Specifically, the court should consider factors such as whether the defendant directed the plaintiff's work and provided or paid for the materials used in the plaintiff's work."  *Id.*

    **B.**    **Application of the *Cuddeback* Factors**

    A detailed analysis of the contract between Spring Hill Radiology (SHR) and Oak Hill Hospital, attached as Exhibit 1 to Defendant's Motion to Dismiss, demonstrates the numerous ways in which the Hospital directed Dr. Mehta's work as an in-house radiologist.  To begin with, Section 1A of Addendum 2 defines SHR's obligation as "provid[ing] all professional services which Facility requires to be provided through the Service."  Put another way, SHR's obligation was to provide only those radiology services which **the** **Hospital** decided to offer.  The Hospital's authority to determine the scope of services provided by SHR pursuant to this contract is made even clearer by the next sentence in Section 1 A, which states that "[a]ny esoteric, unusual or other procedures which cannot reasonably be performed through the Service will be sent to an outside provider selected by Facility."  The Hospital therefore decided not only which types of radiology services SHR would perform under this contract, but also reserved for itself the right to identify esoteric or unusual procedures which SHR was prohibited from doing.  The Hospital even reserved for itself the power to determine which outside providers would be referred esoteric or unusual procedures.

    The Hospital also directed Dr. Mehta's work by limiting which patients Dr. Mehta could treat.  Pursuant to Section 5.14 of the contract, SHR's function was limited to providing exclusive

radiology services "to in-patients and out-patients of Oak Hill Hospital." Moreover, under Section 1.10, Dr. Mehta was prohibited from treating non-Hospital patients at the Hospital.   Therefore, the Hospital directed Dr. Mehta's work by limiting it to only Hospital patients.

Furthermore, the Hospital directed Dr. Mehta's work outside the Hospital by providing in Section 1.9 that conduct by SHR which "constitute[s] a conflict of interest or which materially interferes with (or is reasonably anticipated to interfere with) [SHR's] performance" would constitute a material breach and grounds for termination of the contract.   Contrary to Defendant's claim that "Dr. Mehta was not prohibited from working for other health care facilities", Motion to Dismiss at 10, in fact the Hospital used Sections 1.9 and 3.4 to prevent SHR from obtaining another exclusive radiology services contract at North Bay Hospital, a non-HCA hospital in New Port Richey.  As described in the affidavit of Bill Jennings, Administrator of North Bay Hospital, which is attached as Exhibit 1, SHR was forced to abandon its efforts to obtain an exclusive radiology contract at North Bay Hospital in 1999 as the result of a threat made by a regional HCA vice president that SHR would lose its Oak Hill Hospital contract if it entered the North Bay contract.

The Hospital further directed Dr. Mehta's work by determining when SHR physicians were required to be in the Hospital.  Section 4A of Addendum 2 provides that "[t]he Service shall be conducted during those days and times **which** **Facility** **determines** to be necessary in order to properly address patient needs and effectively coordinate with other operations." (emphasis added)  Although Section 4A(i) required SHR to provide "full time in-house service" 8 hours per day on 5 days per week, the Hospital determined that the 8 hours per weekday when SHR would be working in the Hospital would be between 8:00 am and 5:00 pm.  *See* Dilip Mehta Affidavit attached as Exhibit 2.  Put another way, even if SHR would have preferred to work an 8 hour shift between

3

10:00 am and 7:00 pm, SHR could not do so because the Hospital set SHR's 8 hour weekday schedule as starting at 8:00 a.m.  In addition, however, the Hospital frequently scheduled procedures for SHR physicians at times which were before the scheduled 8:00 a.m. start time. *Id.*  Furthermore, Section 4A(v) provides that the minimum in-house coverage for SHR on weekends was 3 hours, but set no limit on the maximum number of hours SHR physicians could be required to be at the Hospital on weekends.  Pursuant to Section 1E of Addendum 2, SHR was required to conform to "any and all lawful directives issued from time to time by Facility's Chief Executive Officer provided that such directives are consistent with the scope and principles of this Agreement." Therefore, since Section 4A(v) did not contain a ceiling on the number of weekend hours SHR physicians could be required to be in the Hospital, the Hospital was free to require SHR physicians to work whatever number of weekend hours was necessary.

The Hospital also directed Dr. Mehta's work by severely restricting SHR's ability to hire other radiologists to substitute for Dr. Mehta, Dr. Medara and Dr. Weaver.  Under Section 1.2.2, no substitutes for any of these three radiologists could be employed without the Hospital's prior consent.  Moreover, any discontinuation of service by Dr. Mehta, Dr. Medara or Dr. Weaver would be a material breach entitling the Hospital to terminate the contract immediately.

Moreover, the Hospital directed Dr. Mehta's work by controlling SHR's fee schedule and by requiring SHR to become participating providers in HMO and PPO plans selected by the Hospital.  Section C of Addendum 1 required SHR's fee schedule to be **approved in advance** by the Hospital.  In addition, Section 1D of Addendum 2 required SHR to attempt to join HMO and PPO plans selected by the Hospital.  This section even provided that the Hospital could terminate the contract if SHR failed to agree to terms of participation with an HMO or PPO plan selected by

4

the Hospital and as a result the Hospital was threatened with reduced compensation for its services.

Finally, the Hospital directed Dr. Mehta's work by requiring that SHR physicians submit time records to the Hospital and by providing that all records of the work done by SHR physicians were Hospital property.  Section 1.6 of the contract required SHR to "submit complete and accurate time records documenting all time spent in providing services pursuant to this Agreement."  Section 1F of Addendum 2 provided that "[a]ll work done, including documents and materials prepared or developed by Contractor as part of the Services will be the property of Facility."  Section 1B of Addendum 2 stipulates that even the medical records prepared by SHR physicians for patients they treated at the Hospital "shall be and remain the property of Facility", just as documents written by corporate employees remain the property of their corporate employer.

The contract also provides evidence that the second *Cuddeback* factor, which requires that the Hospital provided or paid for materials used in Dr. Mehta's work, was met.  Specifically, Section 3A of Addendum 2 required the Hospital to provide space in the Hospital to perform radiology services, as well as the necessary supplies and equipment.[1]  Furthermore, Section 3B required the Hospital to employ all non-physician technical and clerical personnel necessary for the SHR physicians to provide radiology services.

Accordingly, a detailed analysis of the contract between SHR and the Hospital demonstrates both that the Hospital directed Dr. Mehta's work and that the Hospital provided or paid for materials used in Dr. Mehta's work.  Since both of the *Cuddeback* factors have been met, Dr. Mehta must be

---

[1]The Dilip Mehta Affidavit describes how the Hospital limited the selection of supplies available to the SHR physicians.

considered to be an employee of the Hospital for purposes of Title VII and the Florida Civil Rights Act.

    **C.**    **The *Cilecek* Factors Demonstrate that Dr. Mehta Was An Employee Rather than an Independent Contractor.**

Although Defendant relies on the ten factor test outlined in *Cilecek v. Inova Health System Services*, 115 F.3d 256 (4th Cir. 1997), a close examination of those factors demonstrates they actually prove that Dr. Mehta was an employee of the Hospital, rather than an independent contractor as the Defendant claims:

> Factor 1: "the control of when the doctor works, how many hours he works and the administrative details incident to his work." As demonstrated above, the Hospital controlled when SHR physicians worked during weekdays and whether SHR physicians worked more than 3 hours in the Hospital on weekend days. The Hospital also controlled such administrative details as requiring time records from SHR and even classifying medical records completed by SHR physicians on their own procedures as the property of the Hospital.

> Factor 2: "the source of instrumentalities of the doctor's work." The source of instrumentalities of Dr. Mehta's work was solely the Hospital because Dr. Mehta treated solely Hospital patients with equipment supplied by the Hospital and with the assistance of support staff hired and paid by the Hospital.

> Factor 3: "the duration of the relationship between the parties." SHR had the exclusive contract for radiological services at the Hospital since the mid-1980s and this contract was renewed continuously for 19 years. First Amended Complaint, ¶4. Dr. Mehta performed radiology services at the Hospital pursuant to SHR's exclusive contracts since August 1990. First Amended Complaint, ¶5. The relationship between Dr. Mehta and the Hospital was thus longstanding.

> Factor 4: "whether the hiring party has the right to assign additional work to the doctor or to preclude the doctor from working at other facilities or for competitors." Pursuant to Sections 1E and 4A(v) of Addendum 2, the Hospital had the right to assign additional work to SHR physicians, whether during weekdays or on weekends. On the other hand, the Hospital had the right pursuant to the conflict of interest provisions in Sections 1.9 and 3.4 of the contract  to prohibit SHR physicians from working at other facilities or for competitors. As demonstrated by the affidavits of Bill Jennings and Dr. Mehta, the Hospital used that power both to prevent SHR from

expanding into another exclusive contract with North Bay Hospital, a non-HCA competitor, and to preclude SHR from opening its own imaging center in Spring Hill which might have competed with the Hospital for out-patient services.

Factor 5: "the method of payment." The Hospital relies heavily on this factor because the Hospital did not pay Dr. Mehta for his services. However, the Hospital did exercise control over Dr. Mehta's work by exercising a veto power over SHR's fee schedule. Moreover, this arrangement under which SHR billed insurers for the professional component of procedures for which the Hospital billed the technical component is functionally very similar to the arrangement considered by the Ninth Circuit in *Mitchell v. Frank R. Howard Memorial Hospital,* 853 F.2d 762, 767 (9th Cir. 1988), in which instead of receiving a fixed salary an in-house radiologist received as compensation 40 per cent of the gross billings of the hospital's radiology department.

Factor 6: "the doctor's role in hiring and paying assistants." Dr. Mehta played no role in hiring or paying the staff of the Hospital's Radiology Department who assisted him. Section 3B of Addendum 2 provides that "Facility shall employ all non-physician technical and clerical personnel it deems necessary for the proper operation of the Service" and that "Facility retains full administrative control and responsibility for all such Service personnel."

Factor 7: "whether the work is part of the regular business of the hiring party and how it is customarily discharged." Obviously all major hospitals need a Radiology Department as part of their regular business.

Factors 8 and 9: "the provisions of pension benefits and other employee benefits" and "the tax treatment of the doctor's income." The Hospital emphasizes these factors heavily, but they actually have little to do with the Eleventh Circuit's *Cuddeback* factors.

Factor 10: "whether the parties believe they have created an employment relationship or an independent contractor relationship." Although the Hospital relies on this as the number one reason why Dr. Mehta is not an employee for Title VII or FCRA purposes, there are many reasons why the contract's characterization of SHR as an independent contractor should be neither dispositive nor particularly persuasive. First, as Judge Murnaghan noted in his dissent in *Cilecek,* "[t]he choice of the term 'independent contractor' by Cilecek to describe himself, while the factfinder might pay it attention, was by no means controlling." 115 F.3d at 264, *citing Nationwide Mutual Insurance Co. v. Darden,* 503 U.S. 318 (1992). This is particularly true where, as here, the only proof offered of Dr. Mehta's belief that he was an independent contractor is his agreement to a form contract drafted by the largest hospital chain in the United States which contained a boilerplate independent

contractor paragraph that was of no practical import at the time to either SHR or Dr. Mehta.  Second, the inclusion of a boilerplate independent contractor paragraph in the contract between SHR and the Hospital has absolutely nothing to do with the economic realities of the relationship between these two entities which the Eleventh Circuit has said is the key to deciding who is an employee covered by Title VII and who has no such legal protection against otherwise illegal discrimination.

By any fair analysis, most of the *Cilecek* factors, and most of the most important factors, favor characterizing Dr. Mehta as an employee rather than an independent contractor for Title VII and FCRA purposes.  For example, 4 of the first 5 *Cilecek* factors, and 6 of the top 7 factors, support Dr. Mehta's contention that he functioned as an employee of the Hospital and therefore deserves to be protected by Title VII and the FCRA from the Hospital's illegal discrimination.

**D.**   **Case Law Supports Finding Dr. Mehta to be a Hospital Employee rather than an Independent Contractor.**

Although Defendant cited *Mitchell v. Frank R. Howard Memorial Hospital,* 853 F.2d 762 (9th Cir. 1988), for another proposition, it neglected to inform the Court that *Mitchell* is the only published case on whether an in-house radiologist such as Dr. Mehta is an employee or an independent contractor for Title VII purposes--and that in *Mitchell* the Ninth Circuit reversed the district court's dismissal of Dr. Mitchell's Title VII claims on independent contractor grounds.  The facts of *Mitchell* are very similar to this case and the Ninth Circuit's analysis supports denying the Defendant's motion to dismiss.

The Ninth Circuit relied on several key factual allegations to conclude "from the facts alleged, that the Hospital enjoyed considerable control over 'the means and manner' of Dr. Mitchell's performance."  *Id.* at 767.  First, Dr. Mitchell alleged "that all radiology services were provided at the Hospital, and that at least some of the equipment used was provided by the Hospital." *Id.*  Second, Dr. Mitchell alleged "that his agreement with the Hospital provided that he would treat

8

Hospital patients. *Id.* Third, Dr. Mitchell did "not allege that he used the Hospital's facilities to treat his own patients." *Id.* Fourth, Dr. Mitchell alleged that "his agreement with the Hospital provided that he would receive in compensation for his services forty percent of the gross billings of the radiology department during the time the agreement was in effect." *Id.* Based on these facts, the Ninth Circuit concluded that "this is not a situation in which 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief'" and therefore reversed the district court's dismissal of the plaintiff's Title VII counts.

Three of the four key factual allegations relied on by the Ninth Circuit in *Mitchell* are also present in this case. As in *Mitchell,* all of Dr. Mehta's radiological services were performed at the Hospital on Hospital patients. Moreover, unlike in *Mitchell* in which some of the equipment used was provided by the Hospital, in this case the Hospital provided all the equipment and supplies used by Dr. Mehta. Finally, Dr. Mehta, like Dr. Mitchell, did not use Hospital facilities to treat his own patients. Furthermore, even though the payment arrangement in *Mitchell* differs from the arrangement here, the Ninth Circuit obviously did not give much weight to that fact because it noted that "it was not entirely clear that this method of payment tends to bolster Dr. Mitchell's assertion that for Title VII purposes, he was an employee of the Hospital ...." *Id.* Therefore, this Court should follow the Ninth Circuit's analysis and reach the same conclusion that the Defendant has failed to meet the heavy burden necessary to warrant granting its motion to dismiss.

Other courts also have denied motions to dismiss Title VII claims based on allegations that the plaintiff health care provider was an independent contractor. *Salomon v. Our Lady of Victory Hospital,* 1999 WL 955513, *4 (W.D.N.Y. 1999) (denying defendants' motion to dismiss gastroenterologist's Title VII claims pursuant to Rule 12(b)(1) and 12(b)(6)) ("Because the plaintiff

has alleged facts which point to at least a modicum of hospital control over certain aspects of her practice, it cannot be said at this time that there exists no set of facts on which relief might be granted"); *Vakharia v. Swedish Covenant Hospital,* 765 F.Supp. 461, 468 (N.D. Ill. 1991) (denying motion to dismiss anesthesiologist's Title VII claims) ("Because of her specialty (anesthesiology), Vakharia did not have an outside practice or outside patients whom she would admit to the Hospital as she deemed necessary; rather she obtained patients through assignment by the Hospital and referral by staff surgeons at the Hospital who requested her services....  In these circumstances, the allegations of the complaint clearly do not preclude the possibility that Vakharia and the Hospital shared an employment relationship").[2]

In contrast, the cases relied on by the Defendant clearly are distinguishable.  *Cilecek v. Inova Health System Services,* 115 F.3d 256 (4th Cir. 1997), the principal case cited by the Defendant, affirmed a summary judgment order, not an order granting a motion to dismiss at the outset of the case.  Moreover, the factual situations of Dr. Cilecek and Dr. Mehta are completely different.  *Id.* at 259, 261.  While Dr. Cilecek worked at other hospitals, Dr. Mehta did not and was barred by SHR's contract from doing so.  While Dr. Cilecek had no on-call responsibilities of any kind, SHR was on-call 24 hours a day seven days a week.  Finally, while Dr. Cilecek chose each month how many emergency room shifts he wanted to work, Dr. Mehta helped SHR run the entire radiology department at Oak Hill Hospital year after year since 1990.

In *Alexander v. Rush North Shore Medical Center,* 101 F.3d 487 (7th Cir. 1996), the Seventh Circuit likewise affirmed a summary judgment order, not an order granting a motion to dismiss.

---

[2]At a later stage in this case the district court granted summary judgment for the hospital on the doctor's Title VII claims.  *Vakharia v. Swedish Covenant Hospital*, 987 F.Supp. 633 (N.D. Ill. 1997).

Moreover, unlike Dr. Mehta, Dr. Alexander, an anesthesiologist, "was free to associate himself with other hospitals if he wished to do so." *Id.* at 493.  Similarly, in *Diggs v. Harris Hospital-Methodist, Inc.,* 847 F.2d 270 (5th Cir. 1988), the Fifth Circuit affirmed a judgment which the district court entered for the Hospital against the OB/GYN plaintiff rather than an order granting a motion to dismiss.  Unlike Dr. Mehta whose livelihood depended on SHR's exclusive contract with Oak Hill Hospital, "[t]here was no evidence submitted at [Dr. Diggs'] trial, however, that privileges at Harris Hospital were necessary to her practice ...." *Id.* at 273.

Finally, although the Fourth Circuit affirmed an order granting a motion to dismiss an internist's Title VII claims in *Bender v. Suburban Hospital, Inc.,* 159 F.3d 186 (4th Cir. 1998), that case concerned an office-based physician who was admitted to another hospital. *Bender v. Suburban Hospital,* 998 F.Supp. 631, 632-33 (D. Md. 1998).  Indeed, the district court in *Bender* distinguished office-based physicians like Dr. Bender who merely have privileges at a hospital from hospital-based physicians like Dr. Mehta who are "employed by a hospital on a full-time basis to treat the hospital's patients." *Id.* at 635.

This Court should follow the factually analogous analysis of the Ninth Circuit in the *Mitchell* radiologist case and deny the Defendant's motion.  The Defendant's reliance on summary judgment cases or cases following trials is misplaced because the standards applied at those stages of litigation are too different from the standard this Court must apply at the motion to dismiss stage.  In addition, the cases relied on by the Defendant are distinguishable factually from this case because "[t]he physicians' practices in those cases, moreover, were marked by a much stronger sense of independence and self-determination than [Dr. Mehta's] practice seems to be." *Vakharia v. Swedish Covenant Hospital,* 765 F.Supp. 461, 468 (N.D. Ill. 1991).

11

II.     **Dr. Mehta's claims of discriminatory interference with employment opportunities with Spring Hill Radiology under Title VII and the FCRA should not be dismissed because Spring Hill Radiology need not be an "employer" of 15 or more employees in order for Oak Hill Hospital to be liable under Title VII and the FCRA for interfering with Dr. Mehta's employment relationship with a third party.**

Defendant argues that Dr. Mehta's claims that Oak Hill Hospital's illegal discrimination interfered with his employment relationship with Spring Hill Radiology cannot state a valid claim because Spring Hill Radiology is not an "employer" under Title VII and the FCRA since SHR does not employ 15 or more employees.  This argument should be rejected because neither the language of Title VII nor caselaw from the Eleventh Circuit and other circuits require that the third party whose employment relationship with the plaintiff is interfered with by a defendant-employer must itself qualify as an "employer" under Title VII.

Under 42 U.S.C. §2000e-2(a)(1), it is illegal for "an employer" to "discriminate against any individual" based on race, color or other specialized criteria.  Spring Hill Radiology is not required to be an employer of 15 or more employees under the third party interference theory because "nowhere are there words of limitation that restrict references in [Title VII] to 'any individual' as comprehending only an employee of an employer." *Sibley Memorial Hospital v. Wilson,* 488 F.2d 1338, 1341 (D.C. Cir. 1973).  In addition, Title VII's remedial provisions regarding the filing of complaints with the EEOC and law suits in district court refer to the "person aggrieved", rather than to "the employee", "and that term can certainly be taken as comprehending individuals who do not stand in a direct employment relationship with an employer."  *Id.*

The Eleventh Circuit implicitly rejected the Defendant's argument in *Pardazi v. Cullman Medical Center,* 838 F.2d 1155, 1156 (11th Cir. 1988).  In *Pardazi*, a doctor sued a hospital under Title VII for denying his application for staff privileges.  Prior to applying for staff privileges, Dr.

12

Pardazi "had entered into an employment contract with Terry D. Neumaster, M.D., P.C., an Alabama corporation", which was conditioned upon Dr. Pardazi obtaining staff privileges at Cullman Medical Center. *Id.* at 1155. The district court granted the medical center's summary judgment motion on the grounds that Dr. Pardazi was not an employee of the medical center. On appeal, Dr. Pardazi argued that the district court had erred because "the hospital's denial of staff privileges interfered with his employment opportunities-i.e., his employment contract with Terry D. Neumaster, M.D., P.C., an Alabama corporation." *Id.* at 1156.

Citing *Sibley Memorial Hospital*, among other cases, the Eleventh Circuit decided that "[i]f Dr. Pardazi can prove his claim that the hospital's discrimination against him interfered with his employment opportunities with the professional corporation, we hold that Title VII would encompass such a claim." *Id.* Citing 42 U.S.C. §2000e-2(a)(1), the Eleventh Circuit "note[d] that such a claim fits squarely within the language of Title VII, making it unlawful 'to discriminate against any *individual* with respect to his compensation, terms, conditions, or privileges of employment." (emphasis in original) Thus, the Eleventh Circuit permitted Dr. Pardazi's third party interference claim to go forward **without any requirement that Terry D. Neumaster, M.D., P.C. be an employer of 15 or more people.**

Similarly, the Ninth Circuit reversed summary judgment on a third party interference claim in *Gomez v. Alexian Brothers Hospital of San Jose,* 698 F.2d 1019 (9th Cir. 1983) (*per curiam).* In *Gomez,* a Hispanic doctor sued under Title VII claiming that a hospital had denied his emergency medicine group's proposal to operate the hospital's emergency room because 5 of the 12 participating physicians in his group were Hispanic. Citing *Sibley Memorial Hospital* and the statutory language discussed above, the Ninth Circuit upheld Dr. Gomez' third party interference claim and reversed

13

summary judgment, without attaching any significance to the fact that Dr. Gomez's group had only 12 employees.

Defendant's attack on Dr. Mehta's third party interference claims also flies in the face of Congress' intent in Title VII to prevent employers from "foreclos[ing], on invidious grounds, access by any individual to employment opportunities otherwise available to him." *Zaklama v. Mt. Sinai Medical Center of Greater Miami, 8*42 F.2d 291, 294 (11th Cir. 1988), *quoting Sibley Memorial Hospital,* 488 F.2d at 1341.  Accepting Defendant's argument would permit large employers to use illegal discrimination to interfere with victim's employment with small employers--with impunity and without fear of liability.  Fortunately, courts, including the Eleventh Circuit, have rejected such a Kafkaesque result.  "To permit a covered employer to exploit circumstances peculiarly affording it the capability of discriminatorily interfering with an individual's employment opportunities with another [uncovered] employer, while it could not do so with respect to employment in its own service, would be to condone continued use of the very criteria for employment that Congress has prohibited." *Zaklama,* 842 F.2d at 294, *quoting Sibley Memorial Hospital,* 488 F.2d at 1341.

Defendant's arguments against Dr. Mehta's third party interference claims conflict with statutory language, are contrary to Congressional intent, and have been rejected by numerous courts of appeal, including the Eleventh Circuit.  This Court should reject these arguments as well.

**III.    Dr. Mehta's Title VII and FCRA claims are not barred by any failure to exhaust administrative remedies because these claims are like, or related to, or grew out of, the allegations contained in Dr. Mehta's EEOC charge.**

Defendant contends that Dr. Mehta's Title VII and FCRA claims should be dismissed "to the extent that the Title VII and FCRA claims alleged are not like or related to those alleged in the [EEOC] Charge."  Defendant's Motion at 14.  Specifically, the Defendant complains that Dr.

Mehta's EEOC Charge "does not mention any claim that the Hospital interfered with Dr. Mehta's employment opportunities with Spring Hill Radiology" and does not "allege, in any way, that the Hospital discriminated against Dr. Mehta through its peer review process." *Id.*

In the Eleventh Circuit, a "plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Gregory v. Georgia Department of Human Resources,* 355 F.3d 1277, 1280 (11th Cir. 2004). The proper inquiry then is whether Dr. Mehta's complaint "was like or related to, or grew out of, the allegations contained in [his] EEOC charge." *Id.* In making this determination, the Eleventh Circuit "has noted that 'the scope of an EEOC complaint should not be strictly interpreted.'" *Id., quoting Sanchez v. Standard Brands, Inc.,* 431 F.2d 455, 465 (5th Cir. 1970). That is because "the provisions of Title VII were not designed for the sophisticated or the cognoscenti, but to protect equality of opportunity among all employees and prospective employees", including "even the most unlettered and unsophisticated ... ordinary people unschooled in the technicalities of the law." *Sanchez,* 431 F.2d at 463.

As a purely factual matter, Defendant's claims are not accurate. Defendant claims that Dr. Mehta's EEOC Charge (Exhibit 2 to Defendant's Motion) did not mention any claim that the Hospital interfered with his employment opportunities with Spring Hill Radiology, but the Charge clearly states that "[o]n February 29, 2004, I was informed by [Hospital CEO Mickey] Smith that the [Hospital] would not renew my contract." In the preceding paragraph of the Charge, Dr. Mehta reported that he had "worked for this Respondent since August 1, 1990, in the capacity of Radiologist." Similarly, Defendant claims that Dr. Mehta's EEOC Charge did not allege in any way that the Hospital discriminated against Dr. Mehta in its peer review process. However, the Charge

alleges that Dr. Mehta "constantly complained" to Hospital CEO Mickey Smith about Dr. Flatau's offensive, violent and ethnically derogatory behavior, as well as to HCA Regional CEO Dan Miller, and yet "nothing has been done about it" except to terminate Dr. Mehta's contract. The Charge specifically alleges, as does the First Amended Complaint, that Dr. Mehta was "retaliated against for internally complaining about national origin discrimination in violation of Title VII of the Civil Rights Act."

The notion that the allegations in the First Amended Complaint are not "like or related to, or grew out of" the allegations in Dr. Mehta's EEOC Charge is silly. Of course the allegation that Dr. Mehta's employment opportunities with Spring Hill Radiology were destroyed when the Hospital wrongfully terminated its longstanding contract with SHR is related to and grew out of the allegations in the Charge that the SHR contract was wrongfully terminated due to Dr. Mehta's national origin and in retaliation for his complaints within the Hospital of national origin discrimination. Similarly, the peer review discrimination allegations in the First Amended Complaint obviously grew out of the allegations in the EEOC Charge that on the one hand nothing was done by the Hospital to correct Dr. Flatau's racist behavior, while on the other hand Dr. Mehta's contract was not renewed in retaliation for his complaints about Dr. Flatau and national origin discrimination at the Hospital.

The Defendant's argument also should be rejected in light of the fact that the purpose of the exhaustion requirement "is that the [EEOC] should have the first opportunity to investigate the alleged discriminatory practices to permit it to perform its role in obtaining voluntary compliance and promoting conciliation efforts." *Gregory, supra,* 355 F.3d at 1279. In this case, the EEOC had no interest in pursuing Dr. Mehta's Charge once it saw that the SHR contract refers to SHR as an

16

independent contractor.  Consequently, how the EEOC Charge language was phrased had no

practical effect on the EEOC in any event.

**IV.     Dr. Mehta's Section 1981 contract termination claims do not fail because Dr. Mehta
         was not a party to the contract between Spring Hill Radiology and the Hospital.**

The Defendant argues that Dr. Mehta's Section 1981 contract termination claims in Counts

V and VI must be dismissed because Dr. Mehta was not a party to the contract between Spring Hill

Radiology and the Hospital.  This argument was rejected by the Ninth Circuit in *Gomez v. Alexian*

*Brothers Hospital of San Jose,* 698 F.2d 1019, 1021-22 (9th Cir. 1983) (*per curiam*).  In *Gomez,* a

Hispanic emergency physician sued a hospital under Section 1981 on the grounds that the hospital

had awarded an emergency room contract to another group rather than his group AES because of

racial discrimination.  The district court granted summary judgment to the hospital on the Section

1981 claim because it held that Dr. Gomez lacked standing because it was AES, rather than Gomez

individually, who had sought and been denied the contract.

On appeal, the Ninth Circuit reversed based on its finding that Dr. Gomez had suffered

injuries distinct from those suffered by his physician group.  Noting that Dr. Gomez alleged that his

group's failure to obtain the emergency room contract had "deprived him of employment as director

of defendants' emergency room and caused him 'humiliation and embarrassment'", the Ninth Circuit

held that "[t]hese injuries are personal to [Dr. Gomez] and distinct from any injuries suffered by AES

as a result of defendants' conduct."  *Id.* at 1021.

In this case, Dr. Mehta has alleged in Counts V and VI that he personally has suffered loss

of earnings, loss of earning capacity, loss of reputation, embarrassment and humiliation.  First

Amended Complaint, ¶¶68 and 76.  Because these injuries are personal to Dr. Mehta and distinct

from any injuries suffered by Spring Hill Radiology, Dr. Mehta should have standing to bring the

Section 1981 contract termination claims contained in Counts V and VI.

Moreover, Dr. Mehta has standing to bring these Section 1981 contract termination claims

because SHR's contract was terminated based on racial discrimination by the Hospital directed at

Dr. Mehta.  First Amended Complaint, ¶¶16, 22, 24, 83.  When an entity's ability to make contracts

is discriminated against because of its principal shareholder's race then both the entity and that

shareholder have standing to sue under Section 1981.  *Great American Tool and Mfg. Co. v. Adolph*

*Coors Co., Inc.,* 780 F.Supp. 1354, 1356 (D. Colo. 1992); *Rosales v. AT&T Information Systems,*

*Inc.,* 702 F.Supp. 1489, 1497-98 (D. Colo. 1988).

**V.   Dr. Mehta's Section 1981 and Title VII Peer Review Process Claims Do Not Fail as a Matter of Law because they do not allege an "Adverse Employment Action."**

Defendant argues that Dr. Mehta's Section 1981 and Title VII peer review process claims fail

as a matter of law because they do not allege an "adverse employment action."  This argument

ignores multiple paragraphs in the First Amended Complaint which collectively allege that the

Hospital deliberately perverted its peer review process in order to "wrongfully capitulate[] to Dr.

Flatau's racist demands by not renewing its contract with Spring Hill Radiology after 19 years of

continuously renewing this contract; and wrongfully terminat[ing] Dr. Mehta's staff privileges at the

Hospital."  First Amended Complaint ¶22.

The First Amended Complaint alleges that the Hospital perverted its peer review process and

harmed Dr. Mehta by failing to act on the Ad Hoc Committee report which concluded that Karyn

Flatau's allegation against Dr. Mehta was unfounded; by wrongfully excusing all members of the

Medical Executive Committee (MEC) from reviewing the Ad Hoc Committee report; and by

18

wrongfully using the partial Hospital Board without its physician members to try to pressure Dr. Mehta into resigning from the Hospital's Medical Staff. *Id.* The intended purpose of these perversions of the Hospital's peer review process was the Hospital's ultimate adverse employment action of non-renewal of the Spring Hill Radiology contract. *Id. See Mangieri v. DCH Healthcare Authority,* 304 F.3d 1072, 1975 (11th Cir. 2002) (nonrenewal of contract lacking an automatic renewal clause still constituted a "termination" of a pre-existing commercial relationship).

## VI.   Count VII's Breach of Contract claim should not be dismissed for failure to plead evidence of intentional fraud.

Defendant argues that Count VII's breach of contract claim should be dismissed because it does not plead "any evidence of intentional fraud on the part of the Hospital in connection with the peer review process of which Plaintiff complains." Defendant's Motion at 18, *citing Feldman v. Glucroft,* 522 So.2d 798, 801 (Fla. 1988); *Dhaduvai v. Belsito,* 663 So.2d 1356 (Fla. 2nd DCA 1995).

As an initial matter, the requirement to allege extrinsic malice or fraud established by the Florida Supreme Court in *Feldman* and later applied by the Second District Court of Appeal in *Dhaduval* is limited to defamation causes of action. *Feldman,* 522 So.2d at 798 (holding that "a defamation claim under the 1983 statute is not totally abolished since a plaintiff may proceed with such an action if he or she can establish extrinsic evidence of malice or fraud"); *Dhaduval,* 663 So.2d at 1356 (dismissing with prejudice physician's defamation complaint against defendant physician for false statements made during investigation that led to denial of plaintiff's hospital staff privileges). Count VII, however, is a breach of contract claim, not a defamation claim. Consequently, extrinsic malice or fraud was not required to be alleged by *Feldman* and *Dhaduval.*

In addition, the First Amended Complaint does allege extrinsic malice and fraud on the part of Hospital in connection with its perversion of its peer review process. For example, paragraph 15 alleges that the Hospital condoned and affirmed the coercing and inducing of Hospital employees to falsely testify against Dr. Mehta in peer review proceedings and retaliation against Hospital employees who refused to falsely testify against Dr. Mehta in such proceedings. Furthermore, paragraphs 20 and 21 allege that the Hospital's Medical Executive Committee should have acted on the Ad Hoc Committee's report which concluded that Karyn Flatau's allegation against Dr. Mehta was unfounded and thereafter the Hospital should have renewed its contract with SHR. Instead, however, as alleged in paragraph 22, the Hospital bypassed its entire MEC by wrongfully excusing all members of the MEC from reviewing the Ad Hoc Committee report before then using the partial Hospital Board without its physician members to try to pressure Dr. Mehta into resigning from the hospital staff. Finally, as alleged in paragraphs 22-24, the Hospital repeatedly failed to take appropriate action against Dr. Flatau's racist and violent behavior on the one hand while on the other hand it confirmed and condoned discrimination against Dr. Mehta by refusing to renew SHR's radiology contract and by terminating Dr. Mehta's staff privileges. All of this conduct indeed alleges extrinsic malice and fraud on the part of the Hospital.

## CONCLUSION

For the foregoing reasons, the Defendant's Motion to Dismiss should be denied in its entirety.

Respectfully Submitted,
 s/Kevin J. Darken
Todd A. Foster
Florida Bar No. 0325198
Kevin J. Darken
Florida Bar No. 0090956
COHEN, JAYSON & FOSTER, P.A.
201 East Kennedy Boulevard, Suite 1000
Tampa, FL 33602
(813) 225-1655; (813) 225-1921 fax

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on 7th day of June, 2005, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to Donald R. Schmidt (<u>dschmidt@carltonfields.com</u>) and John P. McAdams (<u>jmcadams@carltonfields.com</u>) of Carlton Fields, P.A., attorneys for the Defendant.


   s/Kevin J. Darken                
Attorney