UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DILIP MEHTA, M.D.,                    )
                                      )
        Plaintiff,                    )
                                      )
vs.                                   )          Case No. 8:05-CV-27-T24-TGW
                                      )
HCA HEALTH SERVICES OF FLORIDA, )
INC., d/b/a HCA OAK HILL HOSPITAL,    )
                                      )
        Defendant.                    )
_____/       )


PLAINTIFF'S RESPONSE TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

I.      STANDARD OF REVIEW

        Under Fed.R.Civ.P. 56(c), summary judgment is appropriate only when there is no

genuine issue as to any material fact and the moving party is entitled to judgment as a matter of

law.  The moving party bears the initial burden of showing that there are no genuine issues of

material fact that should be decided at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

The moving party discharges this burden by showing the court that there is an absence of

evidence to support the non-moving party's case.  *Id.* at 325.  Once this burden is discharged, the

non-moving party must then go beyond the pleadings and designate specific facts showing that

there is a genuine issue for trial.  *Id.* at 324.  The Court must consider all inferences drawn from

the underlying facts in a light most favorable to the party opposing the motion and must resolve

all reasonable doubts against the moving party.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242,

255 (1986).  If material issues of fact exist, the court must not decide these disputed issues, but

rather must deny the Motion for Summary Judgment and proceed to trial. *Davis v. Williams*, 2005 WL 1126658, *7 (M.D. Fla. 2005), *reversed* on other grounds, 451 F.2d 759 (11th Cir. 2006).

## II.   FACTUAL BACKGROUND

It is now undisputed that Dr. Arthur Flatau, one of the top ten revenue generating physicians for Oak Hill Hospital, [1] taunted and cursed Dr. Dilip Mehta multiple times in October-November 2003 with vile and profane anti-Indian slurs. Dr. Flatau called Dr. Mehta a "slimy mother fucker Indian bastard" and asked Dr. Mehta what the term "slime ball" meant "in your fucking Indian language." September 16, 2005 Dilip Mehta deposition at 344-45. Dr. Flatau also said "you Indian bastards, you do not belong here, this is not your country ...." April 7, 2006 Dilip Mehta depostion at 46; September 16, 2005 Dilip Mehta deposition at 334. [2] Even Dr. Flatau has admitted calling Dr. Mehta "you Indian son-of-a-bitch", a "fucking Indian bastard", an "Indian slime ball mother fucker", an "Indian slime ball", and perhaps "a fucking Indian", as well as asking Dr. Mehta if he knew "what a fucking slime ball means in your Indian language". September 15, 2005 Arthur Flatau deposition at 172, 254, 290-91. Dr. Flatau also testified that he may have told Dr. Mehta "You mother-fucking Indian bastard, you do not belong here." *Id.* at 207. Dr. Mehta reported Dr. Flatau's various anti-Indian slurs to both Hospital CEO Mickey Smith and Assistant Hospital CEO Tom Edwards. September 16, 2005 Dilip Mehta deposition at 348, 355, 387-91, 404; April 7, 2006 Dilip Mehta deposition at 50, 58-61.

During this same period, Dr. Flatau repeatedly told Hospital CEO Mickey Smith that "either he [Dr. Mehta] was going to leave or I was going to leave." September 15, 2005 Arthur

---

[1] Mickey Smith June 2, 2006 deposition at 103.
[2] Dr. Flatau also told Dr. Mehta to "tell this to your Allah." September 16, 2005 Dilip Mehta deposition at 337. Unbeknownst to Dr. Flatau, Dr. Mehta is a member of the Jain religion, not a Muslim.

Flatau deposition at 194, 234.  Hosptial CEO Mickey Smith also testified that from his very first meeting with Dr. Flatau in September 2003, Dr. Flatau insisted that either Dr. Mehta had to leave the Hospital or Dr. Flatau would.  February 16, 2006 Mickey Smith deposition at 16.  As Mickey Smith testified, "basically each conversation with me was I can't be here if Dr. Mehta is here." *Id.* at 72.  Dr. Flatau   repeated his demand that Mickey Smith force Dr. Mehta, and ultimately the entire Spring Hill Radiology group, out of Oak Hill Hospital in conversations Dr. Flatau had with Mickey Smith every week on a weekly basis from late September 2003 through the end of December 2003.  June 2, 2006 Mickey Smith deposition at 100-101.

As early as September 2003, Mickey Smith told Dr. Mehta that he might not renew the Spring Hill Radiology contract if "Dr. Flatau is not going to budge...."  September 16, 2005 Dilip Mehta deposition at 324.  On October 24, 2003, Mickey Smith told Dr. Mehta that "the only reason where (sic) I will not renew your contract is to--is because of Dr. Flatau's threats." *Id.* at 362; April 7, 2006 Dilip Mehta deposition at 15-16 ("Mickey Smith told me that he did not renew the [Spring Hill Radiology] contract to further Dr. Flatau's interests and Dr. Flatau's desires and that to prevent the adverse actions of Dr. Flatau, which was all racially motivated. And he said that was the only reason not to give you the contract is because of Dr. Flatau... Sir, on October the 24th, about, on or about October 24th, Mickey Smith clearly told me that Dr. Mehta, the only reason not to renew the contract is because of Dr. Flatau's insistence on not renewing the contract").

On December 15, 2003, while Oak Hill Hospital contends that it was still negotiating in good faith with Spring Hill Radiology over the terms of a renewal contract prior to the existing contract expiring on December 31, 2003, Dr. Mehta was summoned to a meeting of the non-

recused members of the Hospital Board of Trustees during which he was informed that he had 48

hours to resign from the Hospital's medical staff or "they would make my life miserable if I

didn't resign." April 7, 2006 Dilip Mehta deposition at 20-24. Even Hospital CEO Mickey

Smith admits that the purpose of this December 15, 2003 meeting was to give Dr. Mehta "the

opportunity to resign before the [peer review] proceedings reached the point where it would be a

reportable event", in which case the sexual abuse allegations against Dr. Mehta would be entered

onto the National Practitioner Data Bank and made available to the public. June 2, 2006 Mickey

Smith deposition at 83, 92. Dr. Mehta was threatened that if he did not resign, additional women

other than Dr. Flatau's wife, Karyn Flatau, would be called as witnesses against him in his peer

review proceeding. *Id.* at 85. To the extent they knew, the Hospital Board members told Dr.

Mehta what they said these other women would testify to. *Id.* In spite of this pressure, Dr.

Mehta refused to resign. *Id,* at 89. Despite its threats, in January 2004 the Hospital Board

ultimately chose not to impose any sanctions on Dr. Mehta after Hospital CEO Mickey Smith

announced his decision not to renew Spring Hill Radiology's exclusive contract. September 16,

2005 Dilip Mehta deposition at 424.

III.   SUMMARY JUDGMENT SHOULD NOT BE GRANTED AS TO PLAINTIFF'S
       INTERFERENCE CLAIMS  UNDER TITLE VII AND THE FCRA (1) BECAUSE
       DILIP MEHTA WAS AN EMPLOYEE OF SPRING HILL RADIOLOGY AND (2)
       BECAUSE HCA INTERFERED WITH DR. MEHTA'S EMPLOYMENT
       <u>OPPORTUNITIES WITH PATIENTS AT OAK HILL HOSPITAL.</u>

       HCA argues that it is entitled to summary judgment on Plaintiff's Title VII and FCRA

interference claims because Plaintiff was not an employee of Spring Hill Radiology ("SHR").

Motion for Summary Judgment at 13-18. This argument ignores 11th Circuit case law.

4

In *Pardazi v. Cullman Medical Center,* 838 F.2d 1155, 1156 (11th Cir. 1988), the Eleventh Circuit held that Title VII encompasses claims that a Title VII employer interfered with a plaintiff's "employment opportunities" with a third party.  Following *Pardazi,* the Eleventh Circuit stated in *Zaklama v. Mt. Sinai Medical Center,* 842 F.2d 291, 294 (11th Cir. 1988), that "[i]t is clear from the language of the statute that Congress intended that the rights and obligations it created under Title VII would extend beyond the immediate employer-employee relationship."  In this case, HCA, a large hospital corporation which is a Title VII employer, interfered with Dr. Mehta's employment opportunities with both Spring Hill Radiology and Dilip Mehta, M.D., P.A.  By wrongfully failing to renew Spring Hill Radiology's contract with Oak Hill Hospital, HCA caused Dr. Mehta to lose the opportunity to earn hundreds of thousands of dollars from his work for Spring Hill Radiology.

HCA's argument fails for two reasons.  First, contrary to HCA's contentions, there clearly is a material issue of fact in dispute as to whether Dr. Mehta was employed by Spring Hill Radiology.  Dr. Mehta examined patients in the Hospital's Radiology Department pursuant to a contract between SHR and the Hospital.  His work resulted in claims being submitted to insurers by SHR.  SHR in turn paid Dilip Mehta, M.D., P.A., which then paid Dr. Mehta himself.  The fact that Dr. Mehta was paid by SHR is significant because an individual's receipt of compensation is an important factor in determining who is an employee for Title VII purposes. *Llampallas v Mini-Circuits, Lab, Inc.,* 163 F.3d 1236, 1243 (11th Cir. 1998).  Moreover, SHR controlled Dr. Mehta's work at Oak Hill Hospital by negotiating the exclusive contract with the Hospital that established the hours and terms of his work in the Radiology Department. *See* SHR Contract attached as **Exhibit 1.**  In addition, Dr. Mehta, as HCA has emphasized repeatedly,

5

only had radiology privileges at the Hospital pursuant to his work for Spring Hill Radiology. *Id.* Finally, the sharing of SHR's profits and losses was with the member professional associations, rather than with Dr. Mehta personally. All of these facts taken together demonstrate that there is a material issue of fact in dispute as to whether Dr. Mehta was employed by Spring Hill Radiology. Therefore, HCA's argument fails.

Second, the 11th Circuit has indicated in *Zaklama* that it believes Title VII applies to situations in which hospitals interfere with medical professionals' "employment opportunities" with their patients, despite the fact that in such cases patients do not control or supervise the work of their doctors or nurses, and do not intend to permanently employ such medical professionals. *Zaklama,* 842 F.2d at 294, *quoting Sibley Memorial Hospital v. Wilson,* 488 F.2d 1338, 1342 (D.C. Cir. 1973) *and Doe v. St. Joseph's Hospital,* 788 F.2d 411, 421-25 (7th Cir. 1986). Since the 11th Circuit has indicated that Title VII covers discriminatory interference by hospitals with physicians' abilities to have "employment opportunities" with patients, surely Title VII also covers HCA's discriminatory interference with Dr. Mehta's ability to treat radiology patients at Oak Hill Hospital for Spring Hill Radiology. For both of these reasons, HCA's motion for summary judgment must be denied.

IV.  SUMMARY JUDGMENT SHOULD NOT BE GRANTED AS TO PLAINTIFF'S PEER REVIEW PROCESS CLAIMS UNDER SECTION 1981 DUE TO THE "AUTOMATIC EXPIRATION" PROVISION OF THE SPRING HILL RADIOLOGY CONTRACT.

HCA contends that it is entitled to summary judgment as to Plaintiff's peer review process claims under Section 1981 due to the "automatic expiration" provision of the Spring Hill Radiology contract, under which the medical staff privileges of the SHR radiologists "shall automatically expire" upon the termination of SHR's exclusive radiology contract with the

Hospital, despite the fact that the Hospital's Medical Staff Bylaws provide that physicians' staff privileges cannot be taken away without a hearing and an opportunity to appeal.

The Hospital's argument fails for three reasons.  First, it is contrary to the language of the "automatic expiration" provision itself.   Second, it is contrary to Eleventh Circuit precedent.  Third, it is contrary to Florida Statutes §395.0193(3).

The Hospital's argument is contrary to the language of the "automatic expiration" provision itself.  The "automatic expiration" provision relied on by HCA is contained in Section 6 of Addendum 2 of the contract between Spring Hill Radiology and the Hospital.  This provision states that "[u]pon the termination of this Agreement for any reason, the medical staff membership and clinical privileges of Contractor [Spring Hill Radiology] and any and all of Contractor's Representatives shall automatically expire ....  The automatic expiration of a practitioner's medical staff membership and privileges under this Section shall supersede any contrary terms as may be established in the Facility's Medical Staff Bylaws and shall not entitle Contractor nor any of Contractor's Representatives to a hearing or appeal under Facility's Medical Staff Bylaws and/or fair hearing plan."

The fatal flaw in HCA's argument is that this provision only applies "upon the termination of this Agreement ...."  But the contract between Spring Hill Radiology and the Hospital was never terminated, it was simply not renewed after a two month extension period expired at the end of February 2004.  The original contract was from January 1, 2002 through December 31, 2003.  **Exhibit 1** at Paragraph 3.1.  This term was extended for two months in December 2003.

There are two reasons why it is clear this contract was never terminated.  First, Spring Hill Radiology performed services under this contract through the full term stated in the contract.  Second, the term "termination" is used in Section 3 of the contract in ways that make clear it refers solely to an ending of this contract *prior* to its stated ending date of December 31, 2003.  For example, Section 3.2 states that "[e]ither party may terminate this Agreement, without cause, by providing not less than sixty days prior written notice stating the intended date of termination, which shall occur not sooner than the first annual anniversary of the Effective Date."  Similarly, Section 3.4 states that "[e]ither party may terminate this Agreement at any time in the event the other party engages in an act or omission constituting a material breach of any term or condition of this Agreement.  The party electing to terminate this Agreement shall provide the breaching party with not less than sixty days advance written notice specifying the nature of the breach."  Finally, Section 3.5 states that the Hospital may terminate this contract immediately upon, among other events, the Hospital's loss of certification as a Medicare provider, the closure of the Hospital, or the death or permanent disability of Spring Hill Radiology.  All of these parts of Section 3 clearly indicate that the "automatic expiration" provision relied on by HCA in its summary judgment motion does not apply to the facts of this case because the contract between Spring Hill Radiology and the Hospital was never terminated..

In addition, the Hospital's argument is contrary to the old Fifth Circuit's decision in *Northeast Georgia Radiological Associates, P.C. v. Tidwell,* 670 F.2d 507, 508 (5th Cir. Unit B 1982), in which the old Fifth Circuit considered a case involving an exclusive contract between a radiologist and a county hospital authority.  This contract provided

that the radiologist's "staff privileges would be withdrawn if the radiology services agreement was terminated." *Id.* The medical staff bylaws of the hospital provided that notice and a hearing within a seven day period was required when staff privileges were suspended or terminated. *Id.* at 511. In addition, the bylaws provided for appellate review by both the Medical Executive Committee and the Hospital Authority. *Id.*

The radiologist, Dr. Horne, sued the hospital authority under 42 U.S.C. §1983 on the grounds that the hospital's failure to afford him a pre-termination hearing violated his due process rights. The old Fifth Circuit held that Dr. Horne was entitled to a hearing prior to his staff privileges being suspended or terminated, despite the "automatic expiration" provision of the exclusive contract. *Id.* at 510-11. Noting that "'[e]xplicit contractual provisions may be supplemented by other agreements implied from 'the promisor's words and conduct in the light of the surrounding circumstances'" and that "the meaning (of the promisor's) words and acts is found by relating them to the usage of the past", the old Fifth Circuit held that "[a] part of the [exclusive radiology] contract was the understanding provided Dr. Horne-and all Walton County Hospital physicians with medical staff privileges--of procedural due process prior to the suspension or termination of staff privileges." *Id.* at 511.

The *Tidwell* case remains binding circuit precedent which precludes this Court from granting summary judgment based on HCA's theory. The medical staff bylaws of Oak Hill Hospital, attached as **Exhibit 2,** constitute a binding and enforceable contract between the Hospital and the physicians comprising the medical staff. *Hager v. Venice Hospital, Inc.,* 944 F.Supp. 1530, 1534 (M.D. Fla. 1996) (Kovachevich, J.); *Greenberg v. Mount Sinai Medical Center of Greater Miami, Inc.,*629 So.2d 252, 257 (Fla. 3rd DCA

1993); *Lawler v. Eugene Westhoff Memorial Hospital Association,* 497 So.2d 1261, 1264

(Fla. 5th DCA 1986); *American Medical International, Inc. v. Scheller,* 462 S.2d 1, 10

(Fla. 4th DCA 1984).  Thus, the "explicit contractual provisions" of the contract between

Spring Hill Radiology and the Hospital were supplemented by the terms of the Medical

Staff Bylaws contract between the Hospital and Dr. Mehta.  *Tidwell,* 670 F.2d at 511.

This made the procedural due process protections of the Medical Staff Bylaws "[a] part

of the contract" between Spring Hill Radiology and the Hospital, despite the "automatic

expiration" provision, just as the old Fifth Circuit held in *Tidwell.*

      Finally, the Hospital's argument is contrary to Florida Statutes §395.0193(3),

which provides that hospitals may "suspend, deny, revoke, or curtail the privileges" of

physicians only "after a final determination has been made that one or more of the

following grounds exist: (a) Incompetence; (b) Being found to be a habitual user of

intoxicants or drugs to the extent that he or she is deemed dangerous to himself, herself or

others; c) Mental or physical impairment which may adversely affect patient care; (d)

Being found liable by a court of competent jurisdiction for medical negligence or

malpractice involving negligent conduct; (e) One or more settlements exceeding $10,000

for medical negligence or malpractice involving negligent conduct by the staff member;

(f) Medical negligence other than as specified in paragraph (d) or paragraph (e); [or] (g)

Failure to comply with the policies, procedures, or directives of the risk management

program or any quality assurance committees of any licensed facility."  "Chapter 395,

Florida Statutes contains explicit, substantive criteria upon which a hospital may act to

suspend, deny, revoke or curtail a physician's clinical privileges.  Nothing in these

statutes suggests that an exclusive contract, even if otherwise valid, may be used as a

vehicle to accomplish the same result." *Spunberg v. Columbia/JFK Medical Center, Inc.*, 1997 WL 868607, *2 (Fla.Cir.Ct. 1997), *affirmed*, 719 So.2d 298 (Fla. 4th DCA 1998). Put another way, the Hospital's argument is barred by Section 395.0193(3) because that statute sets forth the only grounds for which Florida hospitals may restrict, limit or revoke the privileges of physicians and none of these authorized grounds has anything to do with a physician losing an exclusive contract with a hospital.

V.   SUMMARY JUDGMENT SHOULD NOT BE GRANTED AS TO
     PLAINTIFF'S PEER REVIEW PROCESS CLAIMS UNDER SECTION 1981
     BECAUSE A MATERIAL ISSUE OF FACT EXISTS AS TO WHETHER
     PLAINTIFF HAS SUFFERED AN
     ADVERSE EMPLOYMENT ACTION.

HCA contends that it is entitled to summary judgment because Plaintiff "has not alleged any adverse outcome from the peer review process"   Defendant's Motion for Summary Judgment at 22.  This argument is both factually inaccurate and barred by the Court's order of August 8, 2005 (docket entry 10).

HCA asserts that Dr. Mehta "affirmatively asserts that the Hospital did not take any disciplinary action against him as a result of the peer review process" and cites paragraph 19 of the Amended Complaint as the basis for this statement.  In fact, however, three paragraphs later in paragraph 22 of the Amended Complaint Dr. Mehta alleges that as a direct result of the Hospital "bypass[ing] the entire Medical Executive Committee by wrongfully excusing all members of the Medical Executive Committee from reviewing the Ad Hoc Committee report" and "wrongfully us[ing] the partial Hospital Board without its physician members to try to pressure Dr. Mehta into resigning from the medical staff of the Hospital" the Hospital "wrongfully capitulated to Dr. Flatau's racist demands by not renewing its contract with Spring Hill Radiology after 19 years of

continuously renewing this contract; and wrongfully terminated Dr. Mehta's staff privileges at the Hospital." Paragraph 22 of Amended Complaint at pages 6-7.

HCA raised this identical defense in its motion to dismiss the amended complaint and this Court properly rejected it. As this Court stated in its order of August 8, 2005 ruling on HCA's motion to dismiss, "Defendant moves to dismiss Plaintiff's peer review process claims under section 1981 because Plaintiff has not alleged an adverse employment action." August 8, 2005 Order at 17-18. The Court rejected this argument after "find[ing] that Plaintiff has sufficiently alleged an adverse employment action" because Plaintiff alleged that HCA wrongfully terminated his staff privileges at the Hospital. *Id.* at 18, citing pages 6-7 of the Amended Complaint.

Nothing has changed at this stage of this case which should cause the Court to alter its prior ruling. Dr. Mehta has testified that the Spring Hill Radiology contract would have been renewed, and his staff privileges therefore retained, "if the peer review [process] has been continued the way it should normally based on the bylaws of the Hospital." April 7, 2006 Mehta Deposition at 12-13. Hospital CEO Mickey Smith has testified to the contrary, that the peer review process had no bearing on his decision not to renew the Spring Hill Radiology contract. June 2, 2006 Mickey Smith Deposition at 92. This is a clear dispute of material fact which bars summary judgment.

VII.    CONCLUSION

Defendant HCA has raised three grounds as the basis for obtaining summary judgment. As demonstrated above, all of these grounds are meritless. Therefore, Defendant's motion for summary judgment should be denied.

Respectfully Submitted,

/s/ Kevin J. Darken
Todd A. Foster
Florida Bar No. 0325198
tfoster@tampalawfirm.com
Kevin J. Darken
Florida Bar No. 0090956
kdarken@tampalawfirm.com
COHEN, JAYSON & FOSTER, P.A.
201 East Kennedy Boulevard, Suite 1000
Tampa, FL 33602
(813) 225-1655; (813) 225-1921 fax

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been furnished via the CM/ECF system **Donald Schmidt, Esq.**, Carlton Fields, P.A., Corporate Center 3, 4221 West Boyscout Blvd, Suite 1000, Tampa, Florida 33607 this 21st day of August, 2006.

/s/ Kevin J. Darken
Kevin J. Darken, Esq.

IN THE CIRCUIT COURT OF THE FIFTH JUDICIAL CIRCUIT
IN AND FOR HERNANDO COUNTY, FLORIDA


KARYN FLATAU,

      Plaintiff,

vs.                  CASE NO. H27-CA-2003-1285-DM

DILIP MEHTA, M.D.,

      Respondent.
_____/




**VIDEOTAPED DEPOSITION OF DILIP MEHTA, M.D.**
**VOLUME I**


TAKEN:            Pursuant to Notice by
                        Counsel for Plaintiff

DATE:             September 16, 2005

TIME:             9:17 a.m. - 12:33 p.m.

LOCATION:       Maxa Enterprises, Inc.
                        d/b/a Deborah Kurtz & Associates
                        1275 Cleveland Street
                        Clearwater, FL  33755


REPORTER:       Debra S. Turner
                        Registered Diplomate Reporter
                        Notary Public
                        State of Florida at Large


---

**MAXA ENTERPRISES, INC.**
**d/b/a Deborah Kurtz & Associates**
**1275 Cleveland Street**
**Clearwater, Florida  33755**
**(727) 441-2404    Fax:  (727) 448-0028**

1    you?

2         A    Yes, sir.

3         Q    How many times had Doctor Flatau called you up

4    until -- and I presume we're referring to the matters

5    pertaining to his allegations?

6         A    Correct.

7         Q    How many times had Doctor Flatau called you?

8         A    He called me one time on October the 17th and this

9    was in response to the extortion letter that he had given us.

10        Q    What did he tell you in his phone call to you on

11   October the 17th?

12        A    And it was mainly that he was very mad that one of

13   the doctors came and approached him and was saying that

14   hopefully everything settles between the two of you, your

15   problems.  So he was really mad at me for talking to

16   physicians.

17        Q    And what did you tell Doctor Flatau?

18        A    He wouldn't let me talk, sir.  He was just mad and

19   he just was cussing.  He was screaming.  He's saying you're

20   going to take away my business and, you know, this is going to

21   cost me money, and I will sue you for loss of income, and I'll

22   take your limbs off and you mother fucking Indian bastards

23   don't belong here and this is not your country.  He just

24   was -- he went on and on at that point.

25        Q    This is on the telephone?

                         MAXA ENTERPRISES, INC.
                    d/b/a Deborah Kurtz & Associates

Page 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DILIP MEHTA, M.D.,
      Plaintiff,            Case No.
                            8:05-CV-27-T24-TGW

vs.

HCA HEALTH SERVICES OF
FLORIDA, INC., d/b/a HCA OAK
HILL HOSPITAL.
      Defendant.
------------------------/

VIDEOTAPED
DEPOSITION OF:      DILIP A. MEHTA, M.D.
TAKEN:              Pursuant to Notice by
                    Counsel for Defendant

DATE:               April 7, 2006

TIME:               9:37 a.m. to 5:34 p.m.

PLACE:              Carlton Fields, P.A.
                    Corporate Center Three
                    Suite 1000
                    Tampa, Florida
REPORTED BY:        Nancy J. Rivera
                    Court Reporter
                    Notary Public
                    State of Florida at Large

VOLUME I        Pages 1 - 122

---

Page 2

1   APPEARANCES:
2
3       DONALD R. SCHMIDT, ESQUIRE
        Carlton, Fields, P.A.
4       Corporate Center Three at International Plaza
        4221 West Boy Scout Boulevard, Suite 1000
5       Tampa, Florida 33607
        813.223.7000
6
        Appeared for the Defendant
7
8       KEVIN J. DARKEN, ESQUIRE
        Cohen, Jayson & Foster, P.A.
9       201 East Kennedy Boulevard, Suite 1000
        Tampa, Florida 33602
10      813.225.1655
11
        Appeared for the Plaintiff
12
13
14  ALSO PRESENT:
15      Hal Craig, Videographer
16      SunRay Legal Video
17
18
19
20
21
22
23
24
25

---

Page 3

1                   I N D E X
2
3                                   PAGE
4   EXAMINATION
5   BY MR. SCHMIDT                    4
6   ERRATA SHEET/SIGNATURE PAGE       122
7
8
9
10
11
12
13              E X H I B I T S
14  DEFENDANT'S
    NO.   DESCRIPTION             PAGE
15
    1   Letter to Mehta from K. Flatau      66
16
    2   11/11/03 letter to Detective Bishop
17      from Mehta                          69
18  3   10/31/03 letter to Mehta from Edwards    90
19  4   11/24/03 letter to Mehta from Edwards
        with attached Professional Services
20      Agreement                           121
21  5   12/22/03 letter to Mehta from Smith     154
22  6   1/19/04 memo to Board and MEC from Smith 160
23  7   5/28/91 Radiology Agreement         170
24  8   12/15/03 letter to Mehta from Richards  197
25

---

Page 4

1               E X H I B I T S
                  (CONTINUED)
2
    DEFENDANT'S
3   NO.   DESCRIPTION             PAGE
4
    9   9/26/91 letter to Mehta from Bissonnette
5       and Bikkasani                       198
6   10  Articles of Incorporation for Dilip
        Mehta, M.D., P.A.                   200
7
    11  Amendment to Partnership Agreement      202
8
    12  2/28/02 Shareholders and Directors
9       Written Consent to Action           206
10  13  2002 U.S. Individual Income Tax Return
        for Dilip and Dipti Mehta           212
11
    14  2002 U.S. Income Tax Return for an S
12      Corporation, Dilip A. Mehta, M.D., P.A. 212
13  15  2002 U.S. Return of Partnership Income
        for Spring Hill Radiology           212
14
    16  2003 U.S. Return of Partnership Income
15      for Spring Hill Radiology           222
16  17  2003 U.S. Income Tax Return for an S
        Corporation, Dilip A. Mehta, M.D., P.A. 222
17
    18  2003 U.S. Individual Income Tax Return
18      for Dilip and Dipti Mehta           222
19  19  2004 U.S. Individual Income Tax Return
        for Dilip and Dipti Mehta           228
20
    20  2004 U.S. Income Tax Return for an S
21      Corporation, Dilip A. Mehta, M.D., P.A. 228
22  21  2004 U.S. Return of Partnership Income
        for Spring Hill Radiology           228
23
    22  12/10/02 Employment Agreement       233
24
25

Page 45

1    Q.  When was the next confrontation with
2  Dr. Flatau?
3    A.  It was on or about October the 17th.
4    Q.  Okay.  2003?
5    A.  Yes, sir.
6    Q.  Okay.  Tell me about that one.
7    A.  When Dr. Flatau called me on my cell phone --
8  first he called my home, then he called my cell phone.
9  He said Mickey Smith had told him to call me.  And he
10  was upset that he had given us an extortion letter and
11  that we had not signed it as of that date yet.
12    Q.  Okay.  And what was this extortion letter?
13    A.  That he wanted Spring Hill Radiology to leave
14  the hospital quietly and not to come back until he
15  finishes practice at Oak Hill Hospital, and in return
16  for that, his wife will drop all her charges, all her
17  allegations.
18    Q.  All right.  So this was a document?
19    A.  Yes, sir.
20    Q.  And it basically said if Spring Hill Radiology
21  leaves the hospital, then Mrs. Flatau will drop her
22  charges?
23    A.  Allegations.
24    Q.  And that's what you refer to as an extortion
25  letter?

Page 46

1    A.  To me, that is an extortion letter, sir.
2    Q.  Okay.  And at some point Dr. Flatau had given
3  this to you?
4    A.  Yes, sir.  He -- his attorneys gave it to my
5  attorneys.
6    Q.  And who was your attorney at the time?
7    A.  Darryl Richards.
8    Q.  And who was Dr. Flatau's attorney at the time?
9    A.  I don't recall, sir.
10    Q.  All right.  And you refused to sign it?
11    A.  That is correct, sir.
12    Q.  Okay.  So after that, Dr. Flatau called your
13  cell phone?
14    A.  Correct, sir.  I'm sorry, let me just take
15  that back.  At that point we had not yet signed the
16  document and that was his contention, that was his
17  anger.
18    Q.  Okay.  So he called because you had not signed
19  this what you call an extortion letter?
20    A.  Correct, sir.
21    Q.  All right.  What did he say?
22    A.  He said I'm going to -- you Indian bastards,
23  you do not belong here, this is not your country, and if
24  you do not sign those documents, I will take your limbs
25  off.

Page 47

1    Q.  Do you recall anything else he said?
2    A.  Yes, sir.  He said some of the physicians in
3  the hospital have come to know about this and this is
4  going to cut into my revenues, and I will sue you for
5  economic damages to me.
6    Q.  Dr. Flatau said that to you?
7    A.  Yes, sir.
8    Q.  Did you know what he was -- what he meant by
9  that?
10    A.  He was concerned that other physicians knowing
11  him trying to throw me out of the hospital would make
12  them upset and stop referring patients to him.
13    Q.  Okay.  And he said that to you?
14    A.  Yes, sir.
15    Q.  Do you recall anything else he said?
16    A.  Not as I sit here right now, but there were
17  some other things that he told me, but I just don't
18  recall at this time, sir.
19    Q.  Okay.  Okay.  What's the next confrontation
20  you can recall?
21    A.  The next confrontation was on October the
22  30th --
23    Q.  Okay.
24    A.  -- Dr. Flatau came into my office -- first,
25  there were three different confrontations on that day --

Page 48

1  there were three different instances on that day, I
2  should say.
3    Q.  Okay.
4    A.  The first instance was I was walking down the
5  hall in the evening at about four o'clock, and Doctor --
6    Q.  At the hospital?
7    A.  -- at the hospital, and Dr. Flatau was walking
8  down the other hallway.  He saw me and he stopped and he
9  started staring and glaring at me, very -- he was very
10  intimidating at that point.  So I changed my course and
11  I went somewhere else.
12    Q.  Okay.
13    A.  The second thing that happened was at about
14  five fifteen p.m. on that day, I was in my office
15  reading my x-rays.  Dr. Flatau stopped by the door of my
16  room, he put his third finger up at me and he said you
17  fucking bastard, you have some balls, I'll cut your
18  balls off, and he left.
19    Q.  All right.
20    A.  And then at about five thirty, he comes back
21  again --
22    Q.  Back to your office?
23    A.  Yes, sir -- he closes the door.  I was
24  dictating at that point, sir.  He comes to me, he yanks
25  the Dictaphone out of my hand, he pushes me to the wall.

IN THE CIRCUIT COURT OF THE FIFTH JUDICIAL CIRCUIT
IN AND FOR HERNANDO COUNTY, FLORIDA

KARYN FLATAU,

      Plaintiff,

vs.                  CASE NO. H27-CA-2003-1285-DM

DILIP MEHTA, M.D.,

      Respondent.

_____/



VIDEOTAPED DEPOSITION OF DILIP MEHTA, M.D.
VOLUME I

TAKEN:              Pursuant to Notice by
                        Counsel for Plaintiff

DATE:              September 16, 2005

TIME:              9:17 a.m. - 12:33 p.m.

LOCATION:         Maxa Enterprises, Inc.
                        d/b/a Deborah Kurtz & Associates
                        1275 Cleveland Street
                        Clearwater, FL  33755

REPORTER:         Debra S. Turner
                        Registered Diplomate Reporter
                        Notary Public
                        State of Florida at Large

---

**MAXA ENTERPRISES, INC.**
**d/b/a Deborah Kurtz & Associates**
**1275 Cleveland Street**
**Clearwater, Florida  33755**
**(727) 441-2404    Fax:  (727) 448-0028**

Volume III, Page 344

1    **A**    I believe so.

2    **Q**    You think that's a universal language?

3    **A**    I believe so.

4    **Q**    Okay.  So you say he gave you the finger.  What else

5    did you say in your letter?

6    **A**    And he said, You have some fucking balls.  I'll cut

7    your balls off, and he left.

8    **Q**    That was all he said on --

9    **A**    He said, I'll cut your balls off.  I'll cut your

10   balls off, and he left.  It was a brief moment and then he

11   left.  So I . . .

12   **Q**    Where were you when he said -- okay.  Is that all

13   you said in the letter about what had happened?

14   **A**    No, sir.

15   **Q**    What else did you say in the letter as what happened

16   on October 30th?

17   **A**    After that, 15 minutes later he came back again to

18   my room.  He closed the door.  He slammed the door closed.  He

19   yanked the dictaphone out of my hand.  He pushed me to the

20   wall.  He ripped the dictaphone from the wall, and he said,

21   You slimy mother fucker Indian bastard.  Do you know in your

22   mother fucking language what it means -- what a slime ball

23   means.

24   **Q**    What else did he say?  Did you put this in the

25   letter?  Is this what you wrote in the letter?

MAXA ENTERPRISES, INC.
d/b/a Deborah Kurtz & Associates

1  **A**   I think so.

2  **Q**   Okay.

3  **A**   Words to that effect, sir.

4  **Q**   Okay.  Now, you recall precise -- his precise words?

5  **A**   Not -- as precise as I can, sir.  No, sir.

6  **Q**   And as you've stated his precise words today, do you

7  have a recollection that those were the precise words that he

8  said?

9  **A**   Yes, sir.

10  **Q**   And did you put the precise words that he said in

11  your letter?

12  **A**   I don't think I put the precise words in there

13  because I was getting -- I think I just wrote that you mother

14  fucking Indian bastards.  Oh, no.  Sorry, sir.  I think it was

15  you mother fucking Indian slime ball.  Do you know what in

16  your language it means or what in your fucking Indian language

17  it means.  Something to that effect, sir.

18  **Q**   Okay.  Language to -- something to that effect?

19  **A**   Yes, sir.

20  **Q**   And you put that specifically in your letter of on

21  November 4th?

22  **A**   Specifically -- yeah, something to that effect, yes,

23  sir.

24  **Q**   And that's in regards to you alleging he had used

25  racial slurs?

1    IN THE CIRCUIT COURT OF THE FIFTH JUDICIAL CIRCUIT
          IN AND FOR HERNANDO COUNTY, FLORIDA
2                    CIVIL DIVISION

3
     KARYN FLATAU,
4
         Plaintiff/Counter Defendant,
5
     vs.                        Case No.: H27-CA-2003-1285
6
     DILIP MEHTA, M.D.,
7
         Defendant/Counter Plaintiff.
8    _____/

9

10

11   VIDEOTAPED
     DEPOSITION OF:      ARTHUR FLATAU, M.D.

12   TAKEN:             Pursuant to Notice by
                        Counsel for Defendant
13
     PLACE:             123 North Main Street
14                      Suite C
                        Brooksville, Florida
15
     DATE:              September 15, 2005
16
     TIME:              10:10 a.m. - 8:00 p.m.
17
     REPORTED BY:       MARY D. ROCK, Notary Public
18                      State of Florida at Large

19

20                      Volume 1 of 2

21

22

23                 JOY HAYES & ASSOCIATES
24                 123 NORTH MAIN STREET
                   BROOKSVILLE, FLORIDA
25                    (352) 799-3435

172

1        Q     But my question is, did you say anything to

2    him in that first meeting about the fact that he is an

3    Indian?

4        A     Yes, I called him an Indian.

5        Q     Did you just say you're an Indian or how did

6    you -- how did it come up?  How --

7        A     I think it was more like "You Indian

8    son-of-a-bitch," or something along those lines, you

9    know, which I know what your implications are, having

10   read your allegations in the newspaper.  You know, that

11   is not a racist comment.  That is calling him what he

12   is, which is a person from India, like I would say you

13   German son-of-a-bitch or you British son-of-a-bitch or

14   you Canadian son-of-a-bitch.

15       Q     Would you say to an African-American "You

16   black son-of-a-bitch"?

17       A     I certainly would, if he sexually battered my

18   wife.

19       Q     So what else did you say to him about him

20   being an Indian in that first meeting?

21       A     I don't recall even the first meeting saying

22   that.  I was very much more upset the second meeting.

23   So I can't -- it's hard for me to recollect, being the

24   fact that it's been, I guess, two years ago.  I do know

25   that my second meeting was much more intense in that

254

1         A      It's possible.

2         Q      Did you call him a fucking Indian bastard

3    during that second -- during that conversation we're

4    talking about now on the telephone?

5         A      I may well have.  I called him an Indian.  He

6    is an Indian.  I'm an American.

7         Q      Is he not an American?

8         A      He may be an American.  I don't know the

9    answer to that.  If he has a citizenship, then he's an

10   American.

11        Q      Did you ever tell him "This is not your

12   country"?

13        A      I don't recall saying that.

14        Q      Is this his country?

15        A      If he's a citizen, sure.

16        Q      You don't know if he's a citizen or not?

17        A      That's correct.

18        Q      So is this his country?

19        A      If he's a citizen.

20        Q      Well, okay.

21        A      I assume Dr. Mehta has gotten his

22   citizenship, and I would say that it is his country, and

23   that he should act appropriately.

24        Q      Have you ever thought, prior to just now,

25   whether or not Dr. Mehta was a citizen?

1       A    Well, you know, did I know him well?  I went

2  down and reviewed x-rays with him.  And never in our

3  conversation did the definition of slimeball come up.

4  So I never really had a chance to talk to Dr. Mehta and

5  say, Dr. Mehta, in case I use this word against you in

6  the future, do you know the meaning of slimeball?  I

7  didn't ask him that.

8       Q    So you asked him, "Do you know what that

9  means in your fucking Indian language," right?

10      A    I don't think I phrased it like that.  I said

11 do you know what that fucking means in the Indian

12 language, not in your fucking Indian language.  I

13 wouldn't put fuck in front of Indian.

14      Q    You wouldn't?

15      A    No, I would not.

16      Q    Did you ever call him a fucking Indian?

17      A    I called him a slimeball mother fucker.  I

18 called him an Indian slimeball mother fucker, is what I

19 recollect.

20      Q    Did you ever call him a fucking Indian?

21      A    You know, like I said, my recollection is I

22 called him an Indian slimeball.

23      Q    Well, I understand that.  So is the answer to

24 my question no, you never called him a fucking Indian?

25      A    I'm not 100 percent sure.  I might have

1    called him a fucking Indian.

2        Q    So if you called him a fucking Indian, then

3    you do -- then you would have put the F word in front of

4    Indian?

5        A    I -- excuse me.  I may well --

6             MR. SNOW:  Objection, mischaracterization of

7             testimony.

8             THE WITNESS:  But the bottom line is the --

9             to me that's not racially motivated or a racial

10            slur.

11   BY MR. FOSTER:

12       Q    It's not?

13       A    No.

14       Q    You were upset with him because, in your

15   view, he had forced himself on your wife, correct?

16       A    Dr. Mehta forced his tongue down my wife's

17   throat and grabbed her breasts, and then proceeded to

18   concoct stories that I was making this up to harm him in

19   some way.

20       Q    Was it particularly offensive to you that he

21   was an Indian and he had forced himself on your wife?

22       A    Absolutely not.  It didn't matter to me where

23   he was from.  You know, if this was -- if this was

24   someone from Orlando, American born southerner, if it

25   was from New York, if he was from Canada, if he was from

1       A       I might have.

2       Q       Did you say "You mother-fucking Indian

3  bastard, you do not belong here"?

4       A       You know, did I say that to him individually,

5  maybe I did.  I don't really know.  I was very upset.

6       Q       Do you remember telling him, "This is not

7  your country.  Women here do not cover their faces"?

8       A       I did not say that to him.

9       Q       Have you ever said that to him?

10      A       I can tell you at a later date that I called

11 him and I would rather get into that later, but if you

12 want me to go into the details now, I will.

13      Q       I'm just --

14      A       It's not chronological.  If you want the

15 story, that doesn't come yet.  That's the last time I

16 talked to Dr. Mehta.

17      Q       That you told him that?

18      A       Yes.  I will tell you what I told him if you

19 ask me the question.

20      Q       Go ahead and tell me.

21      A       Okay.  I don't recall the exact date, but

22 Dr. -- Mickey Smith called me up and said, "Are you

23 there?"  I said, "Yes."  He says, "I need to talk to

24 you."  I said, "Okay."

25              He came up to the office and he says, "I have

IN THE CIRCUIT COURT OF THE FIFTH JUDICIAL CIRCUIT
IN AND FOR HERNANDO COUNTY, FLORIDA


KARYN FLATAU,

      Plaintiff,

vs.                      CASE NO. H27-CA-2003-1285-DM

DILIP MEHTA, M.D.,

      Respondent.

_____/



### VIDEOTAPED DEPOSITION OF DILIP MEHTA, M.D.
### VOLUME I


| | |
|---|---|
| TAKEN: | Pursuant to Notice by Counsel for Plaintiff |
| DATE: | September 16, 2005 |
| TIME: | 9:17 a.m. - 12:33 p.m. |
| LOCATION: | Maxa Enterprises, Inc. d/b/a Deborah Kurtz & Associates 1275 Cleveland Street Clearwater, FL  33755 |
| REPORTER: | Debra S. Turner Registered Diplomate Reporter Notary Public State of Florida at Large |

_____

1    **Q**    Prior to October 30th, you were not fearful for your

2    life?

3    **A**    No, sir.  I was upset, but not fearful.

4    **Q**    Anything else you put in your letter?

5    **A**    That I had phoned Mickey Smith continuously about

6    this.

7    **Q**    Anything else?

8    **A**    It was a one-page letter and I think pretty much I

9    think I said everything.

10   **Q**    I recognize that you have denied the allegations

11   that Mrs. Flatau has made.  If the allegations were true as

12   related to a physician, you as a husband, could you understand

13   why Doctor Flatau would be upset and angry?

14       **MR. DARKEN:**  Objection, calls for speculation,

15       relevance.

16       **THE DEPONENT:**  First, somebody has -- if something

17       like this happens, they have prove it.  There are legal

18       channels that are official ways of doing things.  There

19       are ways of going complaining and not physically

20       assaulting people and asking them that you better sign

21       the agreement letter, you better -- the group should

22       leave.  Those things to me did not make any sense.  They

23       just don't go -- didn't go hand-in-hand.  Would I have

24       done that, no, sir.  I would have gone through the

25       channels, to the authorities, complained and had been

1   **Q**   And you didn't talk to any employees or other

2   representatives of Oak Hill Hospital?

3   **A**   No, sir.

4   **Q**   Did you talk to any doctors during that period about

5   the incident?

6   **A**   I don't recall.

7   **Q**   Did you discuss with any of your doctor colleagues

8   the incident involving Doctor Flatau on the 30th?

9   **A**   I believe I talked to Doctor Caradonna but he was as

10  a chief of staff.

11  **Q**   When did you talk to Doctor Caradonna?

12  **A**   I don't recall, sir, but I kept Mickey Smith

13  continuously informed.   He was in the loop.   Doctor Caradonna

14  was in the loop.

15  **Q**   Was or was not in the loop?

16  **A**   They were.

17  **Q**   Okay.

18  **A**   So they were continuously being informed about.

19  **Q**   And did you -- did they ask you why Doctor Flatau

20  was so angry?

21  **A**   I figured by that time they knew or something, but

22  no, sir.

23  **Q**   Why did you figure that they knew?

24  **A**   Because they conducted interview of the employees or

25  something and all that stuff and for them, and I was on

1    **Q**   Did you talk to any doctors that morning about what

2  had happened with Doctor Flatau?

3    **A**   I don't recall.

4    **Q**   You don't recall telling any doctors what had

5  happened?

6    **A**   I don't think so.

7    **Q**   Who asked for the meeting with Mr. Edwards?

8    **A**   I called Mr. Edwards and I went -- he says, Come by

9  and see me.  So I went at 1:00 o'clock and I was in his

10  office.

11    **Q**   What did you tell him?

12    **A**   And I said, What are you going to do about this?

13  And he said that he had talked to Doctor Flatau and this won't

14  happen again.

15    **Q**   Did -- by the way did you give details of what

16  Doctor Flatau -- what your allegation -- did you tell details

17  to Sue Ruge about what had happened with Doctor Flatau?

18    **A**   Sue Ruge was there.  I told her what happened and --

19    **Q**   In great detail?

20    **A**   No, sir.  I was shaking at that point.  So I didn't

21  give her all the details, but the girls also filled her in

22  with a lot of details, and she was on the phone talking to Tom

23  Edwards.

24    **Q**   Did you give Mr. Edwards details as the instant

25  with Doctor Flatau?

1      A    Some of those details like I told you, yes.  Like he

2  pushed me to the wall, that he yanked the dictaphone, that he

3  did this.  Yes, I told them.

4      Q    Did you think it was important to give details of

5  your confrontation with Doctor Flatau?

6      A    I think it was very important.  I think I made a

7  mistake on that day.  I did not call the police.  I should

8  have.  I should have not left.  I should have stayed there.  I

9  should have called the police that day.  I did not do that.  I

10 made a mistake.  I just walked away and went home.

11     Q    Did you call the police later?

12     A    Yes, sir.

13     Q    When did you call the police?

14     A    I went to the police station on November the 3rd.

15     Q    Who told you to go to the police station?

16     A    I went there on -- my attorneys told me.

17     Q    I don't want to know what your attorneys told you.

18 What else did you tell Mr. Edwards on the 31st?

19     A    That what are you going to do.  He says, I talked to

20 Doctor Flatau.  He does not deny what you saying what

21 happened.  He accepted all of that stuff and he said that this

22 would not happen again.  He said he had talked to Mickey Smith

23 and Mickey Smith had decided not suspend Doctor Flatau and

24 they are not going to stop him from coming into radiology

25 department.  And I said, I was little offended by this.

1    Q    They were going to suspend Doctor Flatau?

2    A    They were not going to suspend Doctor Flatau, and

3  they were --

4    Q    Mr. Edwards is telling you that?

5    A    Yes, sir.  And that they will continue -- and they

6  will not stop Doctor Flatau from coming to radiology

7  department and --

8    Q    Had you requested that they suspend Doctor Flatau?

9    A    Yes, sir.

10   Q    When did you request that?

11   A    To Tom Edwards right there.

12   Q    That 1:00 o'clock meeting?

13   A    Yes, sir.

14   Q    And he immediately responded when you asked if they

15  were -- you requested to suspend Doctor Flatau, he immediately

16  responded that they were not going to do it?

17   A    Yes, sir.

18   Q    Did he consult with anybody in connection with your

19  request?

20   A    I don't know, sir.

21   Q    Was that the first time you had requested that

22  Doctor Flatau be suspended?

23   A    Apparently there must have been a talk between him

24  and Mickey Smith sometime that night and that must have come

25  across with them also.

1     **Q**    Did you request that Doctor Flatau not be permitted

2  to come into the radiology department?

3     **A**    Yes, sir.  I said, You need to protect me.  He said

4  that we cannot stop Doctor Flatau from coming into radiology

5  department.

6     **Q**    What else did you request?

7     **A**    And I told him I said, Mickey -- Tom, if I did this

8  to Doctor Flatau, what do you think would have happened to me?

9  He says, You would automatically be terminated.  So I said,

10  Why not Doctor Flatau?  He said, Yes, I understand what you're

11  saying but this is Mickey Smith's decision.

12     **Q**    Inappropriate contact by a physician, unwelcome

13  physical contact, should result in an immediate suspension of

14  a physician?

15     **A**    Sir, I don't know the descriptive criteria of all of

16  them.

17     **Q**    Is that your opinion?  If a physician is guilty of

18  inappropriate contact in the hospital, should that be cause

19  for immediate suspension?

20     **A**    This was not inappropriate contact, sir.  This was

21  assault.

22     **Q**    Is not assault inappropriate contact?

23     **A**    I don't know, and he's the one who said that.  I

24  said Mickey -- and I didn't ask him for termination.  I didn't

25  ask for.  He said -- He's the one who said that.  I asked him

1    I said, If I had done this to Doctor Flatau, what would have

2    happened?  And he told me that you would have been terminated

3    right away.

4        Q    Mr. Edwards told you that?

5        A    Yes, sir.

6        Q    Okay.  What else did you request?

7        A    And I told him I said, This is not fair.  And he

8    says, Yes, I understand what you're saying, but this is Mickey

9    Smith's decision.  And then they came back and he says, Oh,

10   I'm going to come back and talk to Mickey.  I'll come back and

11   talk to you in the evening.  And they give me the letter of --

12   some kind of letter that said we had agreed to -- we had a

13   meeting and that we are going to -- they are going to give me

14   the contract.  They're working on the draft contract.

15       Q    You got a letter at that meeting with Mr. Edwards?

16       A    Not that meeting, sir.  It's that evening.

17       Q    Okay.  Let's stay at that meeting first.  Anything

18   else happen during that meeting with Mr. Edwards?

19       A    No, sir.  That meeting was over at that point.

20       Q    How long was that meeting?

21       A    About ten minutes maybe.

22       Q    And who else was there?

23       A    That's it.  It was just Mr. Edwards and me there.

24       Q    And when you asked if you had done that to Doctor

25   Flatau, what would happen to you?

1    Q    Anything else happen on November 3rd?

2    A    No, sir.

3    Q    Anything happen on November 4th?

4    A    November 4th is when I gave the letter, my complaint

5  letter, to Mickey -- to the MEC to Mickey Smith.  We went --

6    Q    You were complaining about Doctor Flatau?

7    A    Yes, sir.

8    Q    Did you file any other complaints, other than a

9  police report and a complaint to the MEC, about Doctor Flatau?

10   A    No, sir.

11   Q    Are you aware of Doctor Flatau lying about any

12 events?

13   A    Say that again.

14   Q    Are you aware of any lie that Doctor Flatau has told

15 about any of the events that have transpired?

16   A    Yes, sir.  When I saw the letter from -- when

17 finally we got the copies from Mr. Bishop's interview with the

18 doctor, with the Flataus, there -- and I'm just going by what

19 was said in the letter.  Doctor Flatau says he never touched

20 me and that was a lie.

21   Q    Referring to the October 30th --

22   A    Incident.

23   Q    -- incident?

24   A    He said he never threw the x-ray jackets at me.  He

25 just pulled them and they just fell right there.

**Page 1**

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DILIP MEHTA, M.D.,
          Plaintiff,              Case No.
                                  8:05-CV-27-T24-TGW
vs.

HCA HEALTH SERVICES OF
FLORIDA, INC., d/b/a HCA OAK
HILL HOSPITAL.
          Defendant.
_____/

VIDEOTAPED
DEPOSITION OF:     DILIP A. MEHTA, M.D.
TAKEN:             Pursuant to Notice by
                   Counsel for Defendant

DATE:              April 7, 2006

TIME:              9:37 a.m. to 5:34 p.m.

PLACE:             Carlton, Fields, P.A.
                   Corporate Center Three
                   Suite 1000
                   Tampa, Florida

REPORTED BY:       Nancy J. Rivera
                   Court Reporter
                   Notary Public
                   State of Florida at Large

VOLUME I       Pages 1 - 122

---

**Page 2**

1   APPEARANCES:
2
3     DONALD R. SCHMIDT, ESQUIRE
      Carlton, Fields, P.A.
4     Corporate Center Three at International Plaza
      4221 West Boy Scout Boulevard, Suite 1000
5     Tampa, Florida 33607
      813.223.7000
6
      Appeared for the Defendant
7
8     KEVIN J. DARKEN, ESQUIRE
9     Cohen, Jayson & Foster, P.A.
      201 East Kennedy Boulevard, Suite 1000
10    Tampa, Florida 33602
      813.225.1655
11
      Appeared for the Plaintiff
12
13
      ALSO PRESENT:
14
15    Hal Craig, Videographer
      SunRay Legal Video
16
17
18
19
20
21
22
23
24
25

---

**Page 3**

1                    I N D E X
2
3                                      PAGE
4   EXAMINATION
5   BY MR. SCHMIDT                       4
6   ERRATA SHEET/SIGNATURE PAGE         122
7
8
9
10
11
12
13              E X H I B I T S
14  DEFENDANT'S
    NO.    DESCRIPTION                 PAGE
15
     1   Letter to Mehta from K. Flatau    66
16
     2   11/11/03 letter to Detective Bishop
17       from Mehta                        69
18   3   10/31/03 letter to Mehta from Edwards   90
19   4   11/24/03 letter to Mehta from Edwards
         with attached Professional Services
20       Agreement                        121
21   5   12/22/03 letter to Mehta from Smith   154
22   6   1/19/04 memo to Board and MEC from Smith 160
23   7   5/28/91 Radiology Agreement      170
24   8   12/15/03 letter to Mehta from Richards  197
25

---

**Page 4**

1              E X H I B I T S
                 (CONTINUED)
2
3   DEFENDANT'S
    NO.    DESCRIPTION                 PAGE
4
     9   9/26/91 letter to Mehta from Bissonnette
         and Bikkasani                    198
5   10   Articles of Incorporation for Dilip
6        Mehta, M.D., P.A.                200
7   11   Amendment to Partnership Agreement   202
8
    12   2/28/02 Shareholders and Directors
9        Written Consent to Action        206
10  13   2002 U.S. Individual Income Tax Return
         for Dilip and Dipti Mehta        212
11
    14   2002 U.S. Income Tax Return for an S
12       Corporation, Dilip A. Mehta, M.D., P.A.  212
13  15   2002 U.S. Return of Partnership Income
         for Spring Hill Radiology        212
14
    16   2003 U.S. Return of Partnership Income
15       for Spring Hill Radiology        222
16  17   2003 U.S. Income Tax Return for an S
         Corporation, Dilip A. Mehta, M.D., P.A.  222
17
    18   2003 U.S. Individual Income Tax Return
18       for Dilip and Dipti Mehta        222
19  19   2004 U.S. Individual Income Tax Return
         for Dilip and Dipti Mehta        228
20
    20   2004 U.S. Income Tax Return for an S
21       Corporation, Dilip A. Mehta, M.D., P.A.  228
22  21   2004 U.S. Return of Partnership Income
         for Spring Hill Radiology        228
23
    22   12/10/02 Employment Agreement    233
24
25

Page 57

1   longer, I'm not sure.
2      Q.   All right.  The next confrontation you
3   mentioned was October 17th.  Do you have any specific
4   recollection of talking with Mr. Smith about the October
5   17th cell phone call from Dr. Flatau?
6      A.   Yes, sir.  On or about October the 24th is
7   when I talked to Mickey Smith about this incident.
8      Q.   And that was the meeting you told me about
9   earlier.  Correct?
10     A.   Yes, sir.
11     Q.   And now that we're kind of going through this
12  in a little more detail, do you remember anything else
13  that you haven't already said about the October 24
14  meeting?
15     A.   No, sir.  I told him clearly that Dr. Flatau
16  said you Indian bastards, you don't belong in this
17  country.
18     Q.   And do you recall anything further about what
19  Mr. Smith said to you at the October 24th meeting?
20     A.   I believe Mickey Smith's main concern was the
21  anglo suite for some reason, that's what I felt.  And
22  that the only reason  why he would not renew the
23  contract was to appease Dr. Flatau.
24     Q.   As you testified already today; right?
25     A.   Yes, sir.

Page 58

1      Q.   Okay.  Anything else you remember that you
2   haven't already told me about the October 17 meeting
3   with Mr. Smith?
4      A.   I didn't have a meeting with Mr. Smith on
5   October the 17th, sir.
6      Q.   I'm sorry, October 24th meeting with
7   Mr. Smith.  Thank you.
8      A.   I don't recall, sir, not at this time.
9      Q.   All right.  And the next confrontation with
10  Dr. Flatau you told me about was October 30th.  Do you
11  recall specifically talking with Mr. Smith about the
12  October 30th confrontations with Dr. Flatau?
13     A.   Yes, sir.
14     Q.   And what do you recall about that?
15     A.   It was on or about November the 4th that I
16  talked to Mr. Smith.
17     Q.   Okay.
18     A.   And I told him that I'm extremely afraid of
19  Dr. Flatau; you need to do something to stop him; that
20  he has assaulted me and he's saying it's not over, and
21  I'm afraid that what else is coming at this point, I'm
22  afraid for my life.
23     Q.   Okay.  Do you recall whether Mr. Smith had any
24  response to your statements to him?
25     A.   Sir, his main thing was that I am not going to

Page 59

1   stop -- I am not going to stop Dr. Flatau from coming to
2   radiology department, I am not going to suspend him, and
3   that he'd talk to Dr. Flatau -- he had talked to
4   Dr. Flatau, and Dr. Flatau agreed and acknowledged that
5   yes, he had done what I had told them.
6      Q.   Okay.  Now, at the time that you talked with
7   Mickey Smith on November 4th, had you already received
8   the phone call on November 4th from Dr. Flatau?
9      A.   No, sir.
10     Q.   You had not?
11     A.   No, sir.
12     Q.   So you met with Mr. Smith and following the
13  meeting with Mr. Smith, you got the phone call from
14  Dr. Flatau?
15     A.   Yes, sir.  Dr. Flatau's call was in the
16  evening.  The meeting with Mr. Smith was sometime during
17  the day, early part of the day.
18     Q.   Okay.  Do you recall any specific words that
19  Mr. Smith said to you during the November 4th meeting?
20     A.   Other than what I just told you, sir, I don't
21  recall any others at this time.
22     Q.   The last confrontation you had with Dr. Flatau
23  took place on November the 4th, as you've testified.
24     A.   Yes, sir.
25     Q.   So after this November 4th meeting with

Page 60

1   Mr. Smith, did you have further discussions with
2   Mr. Smith about Dr. Flatau?
3      A.   Yes, sir.
4      Q.   And tell me about those.
5      A.   It was on or about the 12th or 13th of
6   December, somewhere in there, and Mickey Smith came to
7   my office and I told him about the racial slurs again of
8   Dr. Flatau on November the 4th -- on, yeah, November
9   4th, sir, on or about.
10     Q.   Okay.  And do you recall whether Mr. Smith had
11  any response?
12     A.   He at that point said that -- that meeting was
13  mainly also because of the partial -- the full board was
14  recused, the physician members of the board were recused
15  on the 12th --
16     Q.   Well, I don't want to hear about any peer
17  review activity.  So are you saying that Mickey Smith
18  came to your office in connection with peer review
19  proceedings?
20     A.   In connection with the peer review
21  proceedings, yes, sir, but we discussed this issue at
22  that time.
23     Q.   Okay.  Well, I don't want to get into anything
24  you discussed about peer review, but I do want to get
25  into what you discussed about Dr. Flatau's November 4th

15

Page 61

1  call.
2      A.  All right, sir.
3      Q.  So at the meeting when Mr. Smith came to your
4  office, you told him about the November the 4th call.
5  And do you recall any response he made to your having
6  told him about that call?
7      A.  No, sir.  He talked mainly about the peer
8  review process moving forward.
9      Q.  You don't recall any specific response that
10  Mr. Smith had about the November the 4th call?
11      A.  No, sir, I don't.
12      Q.  After this meeting with Mr. Smith on the 12th
13  or 13th of December of 2003, and outside of any peer
14  review context, did you have any further discussions
15  with Mr. Smith about Dr. Flatau?
16      A.  Outside of peer review?
17      Q.  Outside of peer review.
18      A.  We had a meeting on December -- I want to say
19  January the 15th or 16th, somewhere there, with Mickey
20  Smith.
21      Q.  You did?
22      A.  Yes, sir.
23      Q.  You had a meeting with Mr. Smith sometime in
24  the middle of January?
25      A.  Yes, sir.

Page 62

1      Q.  The 15th or 16th you think?
2      A.  Yes, sir.  He came to my office, and that was
3  the time that he said that the board found no evidence
4  of wrongdoing on my part --
5      Q.  All right.  Well, I don't want to get into
6  what he said about peer review.  Did he -- did the
7  meeting on January the 15th or 16th, was any portion of
8  it -- did any portion of it deal with something other
9  than whatever peer review was going on?
10      A.  Yes, sir.  That's what I was getting to.
11      Q.  Okay.
12      A.  That he said that there was no evidence of
13  wrongdoing on my part, but the hospital had decided to
14  not renew the contract as per Dr. Flatau's --
15      Q.  Okay.  And that's what you already told me
16  about earlier this morning.  Right?
17      A.  Yes, sir, as per Dr. Flatau's requests, sir.
18      Q.  Outside of peer review, do you remember
19  anything else about that meeting now that you were
20  talking about it again for a second time?  Anything else
21  that you remember that you haven't already told me
22  today?
23      A.  Not that I recall at this time, sir.
24          MR. DARKEN:  When you're done with this topic,
25  before you go on with the next one, I need to take a

Page 63

1  short break.
2          MR. SCHMIDT:  Sure.  That's fine.  Do you want
3  to take it now?
4          MR. DARKEN:  I can wait.
5          MR. SCHMIDT:  Either way is fine.  Either way
6  is fine, whatever.
7          MR. DARKEN:  Just two minutes.
8          THE VIDEOGRAPHER:  We're off the record, time
9  is 11:15.
10          (Break taken.)
11          THE VIDEOGRAPHER:  We're back on the record,
12  time is 11:24.
13  BY MR. SCHMIDT:
14      Q.  Dr. Mehta, I think it's fair to say that
15  during this time in -- following the September 21st
16  confrontation that you had with Dr. Flatau, that you and
17  Dr. Flatau were not on speaking terms.  Is that a fair
18  statement?
19      A.  Can you rephrase that again, sir?
20      Q.  Well, basically, other than these
21  confrontations you had with Dr. Flatau, there was no
22  other interaction that you had with him, was there,
23  during this period of time?
24      A.  Can you specify that time frame again?
25      Q.  Starting with the first confrontation you had

Page 64

1  with him on September 21st of 2003.
2      A.  Yes, sir.
3      Q.  Okay.  From that period of time until the end
4  of February 2004 when the Spring Hill Radiology contract
5  ended, okay --
6      A.  Yes, sir.
7      Q.  -- is it fair to say that other than those
8  confrontations you told me about, you didn't have any
9  other interaction with Dr. Flatau.  Isn't that right?
10      A.  Not that I recall, sir.
11      Q.  Okay.  So basically, you weren't really
12  speaking to him and he wasn't really speaking to you
13  outside of these confrontation episodes; is that a fair
14  statement?
15      A.  I believe so.
16      Q.  Now, did you want -- now, you were telling
17  Mickey Smith about your interactions with Dr. Flatau.
18  Correct?
19      A.  Yes, sir.
20      Q.  Did you understand that Dr. Flatau was talking
21  to Mickey Smith as well about this general situation?
22      A.  I believe so, sir.  I'm not sure.
23      Q.  You're not sure, okay.  Did you understand
24  that Mickey Smith was acting as kind of an intermediary
25  between you and Dr. Flatau?  Did you view him that way

```
 1        IN THE CIRCUIT COURT OF THE FIFTH JUDICIAL CIRCUIT
              IN AND FOR HERNANDO COUNTY, FLORIDA
 2                       CIVIL DIVISION

 3
     KARYN FLATAU,
 4
         Plaintiff/Counter Defendant,
 5
     vs.                        Case No.: H27-CA-2003-1285
 6
     DILIP MEHTA, M.D.,
 7
         Defendant/Counter Plaintiff.
 8    _____/

 9

10
     VIDEOTAPED
11   DEPOSITION OF:        ARTHUR FLATAU, M.D.

12   TAKEN:                Pursuant to Notice by
                           Counsel for Defendant
13
     PLACE:                123 North Main Street
14                         Suite C
                           Brooksville, Florida
15
     DATE:                 September 15, 2005
16
     TIME:                 10:10 a.m. - 8:00 p.m.
17
     REPORTED BY:          MARY D. ROCK, Notary Public
18                         State of Florida at Large

19

20                        Volume 1 of 2

21

22

23
                     JOY HAYES & ASSOCIATES
24                   123 NORTH MAIN STREET
                     BROOKSVILLE, FLORIDA
25                      (352) 799-3435
```

1  life to that hospital, and this was not an issue that I

2  was going to be able to live with, and either he was

3  going to leave or I was going to leave.

4         Now, if he was going to leave in a couple of

5  months, the first of the year, November, January 15th,

6  that was not a huge issue to me.  You know, I could deal

7  with seeing Mehta there for a few weeks or a couple of

8  months if I knew that he wasn't going to be there for

9  the next fifteen years that I had to work there.  So.

10         I was not unreasonable in my request.  I did

11  not ask for an immediate suspension.  You know, I didn't

12  want to raise any questions.  I didn't even want this to

13  get out.  You know, I didn't particularly want to be

14  here discussing this in front of everybody.

15      Q   Okay.  Did Mickey Smith ever discuss with you

16  the terms of Mehta's or Spring Hill Radiology's contract

17  with the hospital?

18      A   I would say not in detail.

19      Q   Well, did you know the terms of this contract

20  with the hospital?

21      A   No, I -- excuse me.  No, I did not.

22      Q   Did Mickey Smith ever suggest to you any date

23  by which it would be reasonable for Mehta to be gone by?

24      A   I assumed Mehta was gone.  As I told you,

25  when he accepted my offer, okay, and he wasn't there for

234

1  comments or complaints meet the standard of sexual

2  harassment.  He, of course -- that that was information

3  that the hospital is keeping.  They were not -- I was

4  not privileged to that.  I was not told.

5          He said, however, please keep in mind that we

6  interviewed thirty-five people.  We interviewed men; we

7  interviewed women.  We interviewed some older women, and

8  we interviewed some overweight women, you know, so it's

9  not as though every single thirty-five of the employees

10 fit the typical description of a person that Dr. Mehta

11 may elect to inappropriately touch.

12          So one out of thirty-five doesn't sound too

13 bad, but there weren't nearly thirty-five employees that

14 fit that particular knitch, if you will.

15     Q     Did you ever tell Mickey Smith that either

16 Mehta leaves or I leave?

17     A     I'm sorry?

18     Q     Did you ever tell Mickey Smith that Mehta

19 leaves or I leave?

20     A     I told Mickey Smith that I would not be able

21 to work at the hospital.

22     Q     If Mehta remained?

23     A     Yes.

24     Q     You mentioned earlier that you were also

25 encouraged by Dr. Caradonna to do an investigation on

IN THE CIRCUIT COURT OF THE FIFTH JUDICIAL CIRCUIT
IN AND FOR HERNANDO COUNTY, FLORIDA

KARYN FLATAU,

    Plaintiff/Counter Defendant,

vs.

                       Case No.: H27-CA-2003-1285

DILIP MEHTA, M.D.,

    Defendant/Counter Plaintiff.

_____/

| | |
|---|---|
| DEPOSITION OF: | MICKEY SMITH |
| TAKEN: | Pursuant to Notice by Counsel for Defendant |
| PLACE: | Oak Hill Hospital 11375 Cortez Boulevard Brooksville, Florida |
| DATE: | February 16, 2006 |
| TIME: | 10:35 a.m. - 4:20 p.m. |
| REPORTED BY: | MARY D. ROCK, Notary Public State of Florida at Large |

JOY HAYES & ASSOCIATES
123 NORTH MAIN STREET
BROOKSVILLE, FLORIDA
(352) 799-3435

72

1          A    That's the conversation I had with him.

2          Q    Right.  Okay.  Am I hearing something

3    different, that there was a later conversation with

4    Dr. Flatau and Dr. Flatau then said that even if

5    Dr. Mehta left the hospital that the matter couldn't be

6    dropped?

7          A    There were literally dozens of conversations

8    going back and forth, and I apologize, I just don't

9    remember the sequence and the specifics of each one.

10         Q    Okay.  But what you're telling me now is --

11   I'm trying to understand what you're telling me now.

12   What you're telling me now is that in some later

13   conversation with Dr. Flatau he then said, even if

14   Dr. Mehta leaves the hospital, I'm not dropping this

15   matter?

16         A    He didn't say that.  That was what was in the

17   document that his attorney drafted.

18         Q    Okay.  And that was a change in his position

19   from the earlier conversations with you?

20         A    Yeah.  His -- basically each conversation

21   with me was I can't be here if Dr. Mehta is here.  I

22   can't be in the same building as him.

23         Q    But in the early conversations, am I correct

24   that Dr. Mehta was also saying if Dr. Mehta leaves the

25   hospital voluntarily then this matter can be resolved



UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CASE NO. 8:05-CV-27-T24-TGW

DILIP MEHTA, M.D.,

           Plaintiff,

vs.

HCA HEALTH SERVICES OF FLORIDA, INC.
d/b/a HCA OAK HILL HOSPITAL,

           Defendants.

- - -

VIDEO DEPOSITION OF MICKEY SMITH

- - -

June 2, 2006

JOY HAYES & ASSOCIATES
OFFICIAL COURT REPORTERS
SERVING CITRUS, HERNANDO & SUMTER COUNTIES
111 West Main Street
Inverness, Florida 34450
BUS (352) 726-4451

---

PROCEEDINGS:   Deposition of MICKEY SMITH
DATE:          June 2, 2006
TIME:          10:15 - 3:40 p.m.
LOCATION:      OAK HILL HOSPITAL
               11375 Cortez Boulevard
               State Road 50
               Spring Hill, Florida 34611

REPORTED BY:   S. Elaine Kaiser, RPR
               Court Reporter and Notary Public
               State of Florida at Large

APPEARANCES

COHEN, JAYSON & FOSTER, P.A.
201 East Kennedy Boulevard, Suite 1000
Tampa, Florida 33602
Attorneys for Plaintiff
BY:  KEVIN DARKEN, ESQ.
     TODD FOSTER, ESQ.

CARLTON FIELDS, P.A.
Corporate Center 3
4221 W. Boyscout Boulevard
Tampa, Florida 33607-3239
Attorneys for Defendant
BY:  DONALD SCHMIDT, ESQ.

Also present:
   Dilip Mehta, M.D.
   Dave Clunn, Video Technician

---

23
24
25

0003
1                      I N D E X
2   WITNESS:
3   MICKEY SMITH
4        Direct Examination                    5
5   EXHIBIT:

6        Plaintiff's Exhibit No. 1            18
         Plaintiff's Exhibit No. 2            25
7        Plaintiff's Exhibit No. 3            27
         Plaintiff's Exhibit No. 4            37
8        Plaintiff's Exhibit No. 5            42
         Plaintiff's Exhibit No. 6            48
9        Plaintiff's Exhibit No. 7            56
         Plaintiff's Exhibit No. 8            68
10       Plaintiff's Exhibit No. 9            94
         Plaintiff's Exhibit No. 10          106
11       Plaintiff's Exhibit No. 11          162
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

0004
1        VIDEO TECHNICIAN:  Time on the video record
2   is 10:15 a.m.  My name is David Clunn, certified
3   video specialist in association with John
4   LuBrant Court Video, P.O. Box 140870,
5   Gainesville, Florida 37614.
6        I'm here today, June 2nd, 2006, at Oak
7   Hill Hospital, 11375 Cortez Boulevard, Spring
8   Hill, Florida, to video tape the deposition of
9   Mickey Smith in the case of Dilip Mehta, M.D.
10  versus HCA Health Services of Florida, Inc.,
11  d/b/a HCA Oak Hill Hospital, Case No.
12  805CB27T24TGW, filed in District Court, Middle
13  District of Florida.
14       The court reporter is Elaine Kaiser
15  from Joy Hayes and Associates, Court Reporters.
16  P.O. Box 5082, Inverness, Florida 34450.
17       Will counsel please introduce
18  themselves beginning with plaintiff's counsel.
19       MR. DARKEN:  Kevin Darken for Dr. Mehta.
20       MR. FOSTER:  I'm Todd Foster also for
21  Dr. Mehta.
22       MR. SCHMIDT:  Don Schmidt for the
23  defendant.
24       VIDEO TECHNICIAN:  Will the court reporter
25  please swear the witness.



Page 97

(1) **A** I don't believe that was the purpose -- the
(2) purpose of the meeting was to ask him to resign.
(3) **Q** Right.
(4) **A** So he wouldn't be at the hospital if he
(5) resigned.
(6) **Q** I understand that. I'm asking -- you
(7) testified that even after the December 15th meeting
(8) you still wanted to reach a renewal contract with
(9) Spring Hill Radiology, and I'm asking you why.
(10) **A** To avoid the major disruption of changing
(11) radiology groups.
(12) **Q** So despite the fact that you hoped he would
(13) resign?
(14) MR. SCHMIDT: Object to the form.
(15) BY MR. DARKEN:
(16) **Q** Well, let me ask you this: Did you hope he
(17) would resign at the December 15th meeting or
(18) following the December 15th meeting?
(19) **A** I wanted to provide the opportunity for
(20) him. It was his decision. I didn't -- I like
(21) Dr. Mehta very much and I didn't want to see a black
(22) mark on his record.
(23) **Q** Didn't you hope he would resign at or
(24) following the December 15th meeting?
(25) **A** I just wanted to provide the opportunity

Page 98

(1) for him.
(2) **Q** You didn't care one way or the other?
(3) **A** No.
(4) **Q** Did it matter to you one way or the other?
(5) **A** I could answer that once the outcomes had
(6) occurred.
(7) **Q** But whether he resigned or not after the
(8) December 15th meeting was of no consequence to you?
(9) MR. SCHMIDT: Object to the form.
(10) BY MR. DARKEN:
(11) **Q** Go ahead.
(12) **A** I wanted to provide the opportunity for
(13) him.
(14) **Q** Were you disappointed that he didn't
(15) resign?
(16) **A** At that time I thought it was in his best
(17) interests.
(18) **Q** So you were disappointed?
(19) MR. SCHMIDT: Object to the form.
(20) BY MR. DARKEN:
(21) **Q** So you were disappointed?
(22) **A** It's not disappointment. Just that -- I
(23) thought that was in his best interest.
(24) **Q** At the same time you thought it was in the
(25) hospital's interest to renew the contract with Spring

Page 99

(1) Hill Radiology of which he was the principal member,
(2) correct?
(3) **A** He was one of the principal members, yes.
(4) **Q** Well, wasn't he the -- wasn't he the member
(5) you were negotiating with?
(6) **A** Yes.
(7) **Q** Wasn't he the member who was -- well, Dr.
(8) Madera was the most senior member, correct?
(9) **A** Yes.
(10) **Q** But she was only working half time at the
(11) hospital at that point, correct?
(12) **A** Yes.
(13) **Q** So Dr. Mehta was the most senior, the next
(14) most senior member who was working the most hours a
(15) the hospital, correct?
(16) **A** Yes.
(17) **Q** And he was the guy that you and Tom Edwards
(18) were negotiating with, correct?
(19) **A** I believe Dr. Madera was involved in some
(20) of that but he was our primary point of contact.
(21) **Q** Now, you know who Dr. Arthur Flatau is,
(22) correct?
(23) **A** Yes.
(24) **Q** And Dr. Arthur Flatau spoke to you in late
(25) September 2003 and he told you that he wanted

Page 100

(1) Dr. Mehta to leave the hospital, correct?
(2) **A** Yes.
(3) **Q** And he told that to you repeatedly from
(4) late September 2003 through the end of 2003, correct?
(5) **A** Yes.
(6) **Q** How many times did he tell you that he
(7) wanted Dr. Mehta to leave the hospital?
(8) **A** I don't recall but I imagine it came up
(9) every time we met.
(10) **Q** Okay. Well, how often was that?
(11) **A** I don't recall.
(12) **Q** Was that every week?
(13) **A** It probably happened at least weekly, yes.
(14) **Q** Okay. So at least weekly from the end of
(15) September 2003 through the end of 2003, Dr. Flatau is
(16) telling you he wants Dr. Mehta out of the hospital,
(17) right?
(18) **A** Yes.
(19) **Q** And at some point he switches to he wants
(20) not only Dr. Mehta out of the hospital but he also
(21) wants Spring Hill Radiology out of the hospital,
(22) correct?
(23) **A** Yes.
(24) **Q** How often did he tell you he wanted Spring
(25) Hill Radiology out of the hospital?

JUNE 2, 2006

Page 101

(1)  A That probably came about later on.
(2)  Q Later on being in the November?
(3)  A Yes.
(4)  Q 2003.  All right.  And he continues to say
(5)  that to you from November 2003 through the end of
(6)  2003?
(7)  A Yes.
(8)  Q Now, Dr. Flatau you said is a vascular
(9)  surgeon?
(10) A Yes.
(11) Q Does the hospital do -- let me rephrase
(12) that.  The hospital keeps track of procedures and
(13) which doctors do procedures in terms of figuring out
(14) which doctors are bringing money into the hospital,
(15) doesn't it?
(16) A Yes.
(17) Q And where does Dr. Flatau stand in the
(18) rankings of -- how many doctors practice at Spring
(19) Hill roughly, two hundred?
(20) A At?
(21) Q I'm sorry.  At Oak Hill.
(22) A We have over two hundred fifty physicians
(23) on the staff.
(24) Q Where does Dr. Flatau stand in the rankings
(25) of physicians in their ability to bring money into

Page 102

(1)  Oak Hill Hospital?
(2)  A I don't recall specifically.  I think we
(3)  produced that though.
(4)  Q I haven't seen that.  Do you have those
(5)  documents?
(6)  A Yeah.  We can pull from the computer.  I
(7)  thought you asked who the top -- or maybe you asked
(8)  whether he was one of the top five.  That maybe what
(9)  it was.  Which he's not.
(10) Q Where is he?
(11) A I don't know.
(12) Q What documents do you have that list
(13) physicians by income producing status?
(14) A Don't have any.
(15) Q What do you have?
(16) A Computer data base.
(17) Q Okay.  And what does that data base
(18) contain?
(19) A All the financial information on patients
(20) in the hospital.
(21) Q So are you saying you don't have a list but
(22) the data base can generate a list?
(23) A Yes.  And there may -- I probably have a
(24) list as of today in my office or as of last month but
(25) it's not something I retain because you can pull it

Page 103

(1)  up on the computer.
(2)  Q So you don't have a list sitting in your
(3)  office for 2003 but you have data for 2003?
(4)  A Correct.
(5)  Q And Dr. Flatau was not in the top five
(6)  because that's what we had asked for?
(7)  A Correct.
(8)  Q Was he in the top ten?
(9)  A I'm sure he was.
(10) Q Okay.  Was he the most profitable surgeon
(11) for the hospital?
(12) A I don't believe so.
(13) Q Were all the physicians who were more
(14) profitable than him for the hospital surgeons?
(15) A I don't understand that question.
(16) Q Okay.  You said Dr. Flatau was probably in
(17) the top ten most -- generated the most income for the
(18) hospital in 2003.  And I'm asking the doctors who
(19) were one through nine in that list, what type of
(20) doctors were they?
(21) A It would just be a mix of cardiologists,
(22) internists, surgeons.
(23) Q Okay.  So Dr. Flatau keeps talking to you
(24) on a weekly basis about wanting Dr. Mehta and then
(25) wanting Spring Hill Radiology out.  Did you tell him

Page 104

(1)  that the hospital had sent out an extension, a
(2)  renewal contract to Dr. Mehta at the end of November
(3)  or the beginning of December 2003?
(4)  A I don't specifically recall telling him
(5)  that.
(6)  Q Well, he would have been pretty mad if he
(7)  had found that out, wouldn't he?
(8)  A Who the hospital contracts out for
(9)  radiology services is not his business.
(10) Q Okay.  If you had told him don't you think
(11) you would remember that conversation?
(12) A I don't know.
(13) Q Did you deliberately not tell him that?  As
(14) he's talking to you every week about wanting
(15) Dr. Mehta out, did you say I just don't think I'm
(16) going to tell Dr. Flatau that the hospital is
(17) offering a renewal contract to Dr. Mehta?
(18) A It's not any of his business.
(19) Q And you didn't tell him that because you
(20) knew he was going to get real mad?
(21) MR. SCHMIDT:  Object to the form.
(22) THE WITNESS:  I didn't tell him because it
(23) wasn't any of his business.
(24) BY MR. DARKEN:
(25) Q Well, didn't Dr. Flatau tell you throughout

IN THE CIRCUIT COURT OF THE FIFTH JUDICIAL CIRCUIT
IN AND FOR HERNANDO COUNTY, FLORIDA


KARYN FLATAU,

       Plaintiff,

vs.                         CASE NO. H27-CA-2003-1285-DM

DILIP MEHTA, M.D.,

       Respondent.

_____/




**VIDEOTAPED DEPOSITION OF DILIP MEHTA, M.D.**
**VOLUME I**


TAKEN:              Pursuant to Notice by
                      Counsel for Plaintiff

DATE:               September 16, 2005

TIME:               9:17 a.m. - 12:33 p.m.

LOCATION:          Maxa Enterprises, Inc.
                      d/b/a Deborah Kurtz & Associates
                      1275 Cleveland Street
                      Clearwater, FL  33755

REPORTER:          Debra S. Turner
                      Registered Diplomate Reporter
                      Notary Public
                      State of Florida at Large


---

**MAXA ENTERPRISES, INC.**
**d/b/a Deborah Kurtz & Associates**
**1275 Cleveland Street**
**Clearwater, Florida  33755**
**(727) 441-2404   Fax:  (727) 448-0028**

1      **Q**    Okay.  What else did he tell you?

2      **A**    And that Doctor Flatau had alleged inappropriate

3 touching of me to his wife, and that he would not back down

4 and will take nothing less than the group leaving.

5      **Q**    What else did he say to you?

6      **A**    He said that much, and then I told him, Mickey, I

7 have done nothing of the sort, and I don't see any reason why

8 the group should leave the hospital, and we refuse to leave

9 the hospital.

10     **Q**    What else did you say?

11     **A**    Mickey then told me that it looks like we have a

12 stand off.  Doctor Flatau is not going to budge and you will

13 not go.  So he said that I'm going to exercise -- what if I

14 exercise my authority and not renew the contract.

15     **Q**    Did he say, if I or what if I?

16     **A**    I'm not sure exactly.  It was something related to

17 that, what if I exercise my authority and not renew the

18 contract of the group.

19     **Q**    Did Mickey say anything else?

20     **A**    No.  At this point I was upset with him.

21     **Q**    And what did you say?

22     **A**    I said, Mickey, you are the hospital.  You're the

23 authority and that will be your own decision.

24     **Q**    What were you referring to when you said that?

25     **A**    The nonrenewal of the contract.

1     A     That pretty much resolved that issue.

2     Q     As of the date of this conversation, the most recent

3  one we're talking about with Mickey Smith, you advised Mickey

4  Smith that the radiologists did not have an objection to the

5  surgeons utilizing the angiogram suite?

6     A     Correct.  And I told him also that I had a meeting

7  with Sue Ruge and Tom Edwards about that and I told them that

8  already.  It appears like -- it appears like there was a

9  miscommunication or noncommunication between Tom Edwards and

10  Mickey Smith.  The meeting that I had with Tom Edwards and Sue

11  Ruge those -- the decision that was said at that time we told

12  him apparently had not reached Mickey Smith yet.  So he was

13  not aware of that.  So once he was aware of it, he was fine.

14     Q     Did Mickey Smith talk to you about anything else or

15  tell you anything else?

16     A     He said the only -- he said the only reason where I

17  will not renew your contract is to -- is because of

18  Doctor Flatau's threats.

19     Q     And Mickey Smith told you that specifically?

20     A     Because of those effects from Doctor Flatau's

21  threats.

22     Q     And had nothing to do with utilization of the

23  angiogram suites?

24     A     Correct, sir.  Because I had clarified that we

25  didn't have a problem.

## Page 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

_____

DILIP MEHTA, M.D.,
    Plaintiff,    Case No.
           8:05-CV-27-T24-TGW
vs.

HCA HEALTH SERVICES OF
FLORIDA, INC., d/b/a HCA OAK
HILL HOSPITAL,
    Defendant.
_____/


VIDEOTAPED
DEPOSITION OF:    DILIP A. MEHTA, M.D.
TAKEN:    Pursuant to Notice by
    Counsel for Defendant

DATE:    April 7, 2006

TIME:    9:37 a.m. to 5:34 p.m.

PLACE:    Carlton Fields, P.A.
    Corporate Center Three
    Suite 1000
    Tampa, Florida

REPORTED BY:    Nancy J. Rivera
    Court Reporter
    Notary Public
    State of Florida at Large

VOLUME I    Pages 1 - 122

## Page 2

1  APPEARANCES:
2
3  DONALD R. SCHMIDT, ESQUIRE
   Carlton, Fields, P.A.
4  Corporate Center Three at International Plaza
   4221 West Boy Scout Boulevard, Suite 1000
5  Tampa, Florida 33607
   813.223.7000
6
   Appeared for the Defendant
7
8
   KEVIN J. DARKEN, ESQUIRE
9  Cohen, Jayson & Foster, P.A.
   201 East Kennedy Boulevard, Suite 1000
10 Tampa, Florida 33602
   813.225.1655
11
   Appeared for the Plaintiff
12
13
   ALSO PRESENT:
14
   Hal Craig, Videographer
15 SunRay Legal Video
16
17
18
19
20
21
22
23
24
25

## Page 3

1        I N D E X
2
3           PAGE
4  EXAMINATION
5  BY MR. SCHMIDT    4
6  ERRATA SHEET/SIGNATURE PAGE    122
7
8
9
10
11
12
13    E X H I B I T S
14 DEFENDANT'S
    NO.    DESCRIPTION    PAGE
15
    1    Letter to Mehta from K. Flatau    66
16
    2    11/11/03 letter to Detective Bishop
17        from Mehta    69
18 3    10/31/03 letter to Mehta from Edwards    90
19 4    11/24/03 letter to Mehta from Edwards
        with attached Professional Services
20        Agreement    121
21 5    12/22/03 letter to Mehta from Smith    154
22 6    1/19/04 memo to Board and MEC from Smith  160
23 7    5/28/91 Radiology Agreement    170
24 8    12/15/03 letter to Mehta from Richards    197
25

## Page 4

1        E X H I B I T S
        (CONTINUED)
2
3  DEFENDANT'S
    NO.    DESCRIPTION    PAGE
4
5  9    9/26/91 letter to Mehta from Bissonnetta
        and Bikkasani    198
6  10    Articles of Incorporation for Dilip
        Mehta, M.D., P.A.    200
7
    11    Amendment to Partnership Agreement    202
8
    12    2/28/02 Shareholders and Directors
9        Written Consent to Action    206
10 13    2002 U.S. Individual Income Tax Return
        for Dilip and Dipti Mehta    212
11
    14    2002 U.S. Income Tax Return for an S
12        Corporation, Dilip A. Mehta, M.D., P.A.  212
13 15    2002 U.S. Return of Partnership Income
        for Spring Hill Radiology    212
14
    16    2003 U.S. Return of Partnership Income
15        for Spring Hill Radiology    222
16 17    2003 U.S. Income Tax Return for an S
        Corporation, Dilip A. Mehta, M.D., P.A.  222
17
18 18    2003 U.S. Individual Income Tax Return
        for Dilip and Dipti Mehta    222
19 19    2004 U.S. Individual Income Tax Return
        for Dilip and Dipti Mehta    228
20
    20    2004 U.S. Income Tax Return for an S
21        Corporation, Dilip A. Mehta, M.D., P.A.  228
22 21    2004 U.S. Return of Partnership Income
        for Spring Hill Radiology    228
23
    22    12/10/02 Employment Agreement    233
24
25

1

**Page 13**

1  it should normally based on the bylaws of the hospital,
2  sir, I am convinced that the outcome would have been
3  completely different.
4      Q.  What outcome?
5      A.  Of Mickey Smith not renewing my contract, of
6  him passing the judgment what he passed.
7      Q.  Okay. Thank you. Anything else?
8      A.  It amounts to all the aggravation for the last
9  two and a half years with all the attorneys and all this
10  process that we are going through at this time. None of
11  this would have happened had the peer review been
12  followed, sir.
13     Q.  And you think if the peer review had been
14  followed, Spring Hill Radiology would still have its
15  contract with the hospital?
16     A.  Yes, sir, I believe so.
17     Q.  Okay. So who is it specifically at Oak Hill
18  Hospital that you are claiming is responsible for
19  discriminatory decisions or actions against you?
20     A.  Sir, it was the hospital administration, which
21  would be Mickey Smith, Tom Edwards, and, sir, you who
22  were a counsel of the hospital or the administration, I
23  don't know what your role was, but you were present in
24  all those committees, so you know what went on.
25         MR. SCHMIDT:  Okay. Well, I move to strike

**Page 14**

1      that answer about me being present in peer review.
2  BY MR. SCHMIDT:
3      Q.  What discriminatory decisions or actions was
4  Mickey Smith responsible for?
5      A.  Mickey Smith condoned all the racial slurs and
6  the discriminatory actions that Dr. Flatau wanted to
7  take. He pursued the intentions of Dr. Flatau and
8  continued on and refused to renew the contract,
9  specifically eliminating the Spring Hill Radiology,
10  which was a – potentially an Indian-based radiology
11  group at Oak Hill Hospital at that time.
12     Q.  And what specific decisions or actions was Tom
13  Edwards – discriminatory decisions or actions against
14  you is Tom Edwards responsible for?
15     A.  He was fully aware. I had complained to him
16  about the racial slurs, the assaults, the mental – the
17  derogatory statements that were made by Flatau. He was
18  aware of all the issues at the hospital and he condoned,
19  again, with Mickey Smith.
20     Q.  Did Mickey Smith ever tell you that the reason
21  he decided not to renew the Spring Hill Radiology
22  contract was because of your race? Did Mickey Smith
23  ever tell you that?
24     A.  Can you repeat that question again?
25     Q.  Did Mickey Smith ever tell you that the reason

**Page 15**

1  he decided not to renew the Spring Hill Radiology
2  contract was because of your race?
3      A.  Mickey Smith told me that he did not renew the
4  contract to further Dr. Flatau's interests and
5  Dr. Flatau's desires and that to prevent the adverse
6  actions of Dr. Flatau, which was all racially motivated.
7  And he said that the only reason not to give you the
8  contract is because of Dr. Flatau.
9      Q.  When did Mickey Smith tell you that?
10     A.  Somewhere on or about October the 24th, 2003.
11     Q.  So your position is Mickey Smith decided not
12  to renew the Spring Hill Radiology contract because of
13  Dr. Flatau?
14     A.  Yes, sir.
15     Q.  And you believe that Dr. Flatau had a racial
16  and national origin bias against you?
17     A.  Yes, sir.
18     Q.  In what specific meeting or conversation did
19  Mickey Smith make these statements?
20     A.  This was the meeting of somewhere about
21  October 24th, 2003. And there were various other
22  meetings with Mickey Smith where he continued to say
23  that he would not renew the contract because of
24  Dr. Flatau.
25     Q.  Can you give me any specifics about those

**Page 16**

1  other meetings or conversations?
2      A.  Sir, it's a very vague and broad question.
3  Can you be more specific and I can tell you.
4      Q.  Well, you're telling me that on several
5  occasions Mickey Smith told you that he was not renewing
6  the contract because of Dr. Flatau, and I'm just asking
7  for the specifics of when he said that and where he said
8  it and exactly what he said to you, as much as you can
9  remember.
10     A.  Sir, on October the 24th, about, on or about
11  October 24th, Mickey Smith clearly told me that
12  Dr. Mehta, the only reason not to renew the contract is
13  because of Dr. Flatau's insistence on not renewing the
14  contract. He's going to go to the papers, he's going to
15  go to the police, he's going to go to the board, he's
16  going to destroy the reputation of the hospital if I do
17  not follow through; and this has nothing to do with you
18  as a radiologist, your services or anything else.
19     Q.  And Mickey Smith said that in this meeting you
20  had with him?
21     A.  Yes, sir.
22     Q.  And you think it was about October the 24th?
23     A.  Yes, sir.
24     Q.  Who else – was anyone else there?
25     A.  No, sir.

4



**Page 1**

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DILIP MEHTA, M.D.,
    Plaintiff,    Case No.
                8:05-CV-27-T24-TGW
vs.
HCA HEALTH SERVICES OF
FLORIDA, INC., d/b/a HCA OAK
HILL HOSPITAL,
    Defendant.
_____/

VIDEOTAPED
DEPOSITION OF:    DILIP A. MEHTA, M.D.
TAKEN:    Pursuant to Notice by
          Counsel for Defendant

DATE:    April 7, 2006

TIME:    9:37 a.m. to 5:34 p.m.

PLACE:    Carlton Fields, P.A.
          Corporate Center Three
          Suite 1000
          Tampa, Florida
REPORTED BY:    Nancy J. Rivera
          Court Reporter
          Notary Public
          State of Florida at Large

VOLUME I    Pages 1 - 122

**Page 2**

1  APPEARANCES:
2
3    DONALD R. SCHMIDT, ESQUIRE
    Carlton, Fields, P.A.
4    Corporate Center Three at International Plaza
    4221 West Boy Scout Boulevard, Suite 1000
5    Tampa, Florida 33607
    813.223.7000
6
    Appeared for the Defendant
7
8
    KEVIN J. DARKEN, ESQUIRE
9    Cohen, Jayson & Foster, P.A.
    201 East Kennedy Boulevard, Suite 1000
10   Tampa, Florida 33602
    813.225.1655
11
    Appeared for the Plaintiff
12
13
  ALSO PRESENT:
14
    Hal Craig, Videographer
15  SunRay Legal Video
16
17
18
19
20
21
22
23
24
25

**Page 3**

1          I N D E X
2
3              PAGE
4  EXAMINATION
5  BY MR. SCHMIDT      4
6  ERRATA SHEET/SIGNATURE PAGE    122
7
8
9
10
11
12
13        E X H I B I T S
14  DEFENDANT'S
    NO.    DESCRIPTION        PAGE
15
    1    Letter to Mehta from K. Flatau    66
16
    2    11/11/03 letter to Detective Bishop
17      from Mehta    69
18   3    10/31/03 letter to Mehta from Edwards   90
19   4    11/24/03 letter to Mehta from Edwards
        with attached Professional Services
20      Agreement    121
21   5    12/22/03 letter to Mehta from Smith   154
22   6    1/19/04 memo to Board and MEC from Smith  160
23   7    5/28/91 Radiology Agreement    170
24   8    12/15/03 letter to Mehta from Richards  197
25

**Page 4**

1        E X H I B I T S
        (CONTINUED)
2
3  DEFENDANT'S
    NO.    DESCRIPTION        PAGE
4
5   9    9/26/91 letter to Mehta from Bissonnette
        and Bikkasani    198
6   10   Articles of Incorporation for Dilip
        Mehta, M.D., P.A.    200
7
8   11   Amendment to Partnership Agreement  202
9   12   2/28/02 Shareholders and Directors
        Written Consent to Action    206
10  13   2002 U.S. Individual Income Tax Return
11      for Dilip and Dipti Mehta    212
   14   2002 U.S. Income Tax Return for an S
12      Corporation, Dilip A. Mehta, M.D., P.A.  212
13  15   2002 U.S. Return of Partnership Income
14      for Spring Hill Radiology    212
15  16   2003 U.S. Return of Partnership Income
        for Spring Hill Radiology    222
16  17   2003 U.S. Income Tax Return for an S
17      Corporation, Dilip A. Mehta, M.D., P.A.  222
18  18   2003 U.S. Individual Income Tax Return
        for Dilip and Dipti Mehta    222
19  19   2004 U.S. Individual Income Tax Return
20      for Dilip and Dipti Mehta    228
   20   2004 U.S. Income Tax Return for an S
21      Corporation, Dilip A. Mehta, M.D., P.A.  228
22  21   2004 U.S. Return of Partnership Income
        for Spring Hill Radiology    228
23
   22   12/10/02 Employment Agreement    233
24
25

1

Page 21

1    Q. And who said that?

2    A. It was one of the board members, sir, partial

3 board member.

4    Q. Okay. What was the reason for your meeting

5 with the board of trustees on or about December the 15th

6 of 2003?

7    A. It was Mickey Smith who wanted -- and this was

8 not the board, sir, this was a partial board. There

9 were no physician members of the board during this

10 meeting.

11    Q. All right. What was the occasion that you

12 were meeting with the board? Why were you meeting with

13 the board?

14    A. Mickey Smith told me to meet the board, the

15 partial board, sir.

16    Q. And was this meeting in any way connected with

17 any peer review proceedings, or was it a separate

18 meeting, separate from peer review?

19    MR. DARKEN: Objection, calls for a legal

20 conclusion.

21 BY MR. SCHMIDT:

22    Q. If you know.

23    A. I don't know, sir.

24    Q. All right. Well, if you don't know, then I'm

25 going to ask you some questions about it.

Page 22

1    MR. SCHMIDT: Mr. Darken, I would like an

2 agreement from you that if it turns out ultimately

3 that this is connected with peer review, I would

4 request your agreement that it would not constitute

5 a waiver of peer review privilege.

6    MR. DARKEN: All right.

7    MR. SCHMIDT: And also I will move to strike

8 all the testimony relating to the meeting if, in

9 fact, it turns out that this meeting is connected

10 with peer review.

11 BY MR. SCHMIDT:

12    Q. Okay. So when did this meeting take place, in

13 the morning, afternoon, evening, do you remember?

14    A. It was in the early afternoon, sir.

15    Q. Early afternoon. And the nonphysician members

16 of the board were present?

17    A. Yes, sir. There were only two nonphysician

18 members of the board.

19    Q. Do you recall who they are, who they were?

20    A. One of them is a reverend, I believe his name

21 is Chet Opoktsi, and I don't know how to pronounce his

22 last name -- or spell his last name, O-P-O-K-T-S-I, or

23 something to that effect. And the other one was a

24 president of Bank of America and I am blocking his name

25 at this time, sir.

Page 23

1    Q. And Mickey Smith was there?

2    A. And Mickey Smith was there, sir, and you were

3 there, sir.

4    Q. You don't recall who it was that said you had

5 48 hours to resign?

6    A. I believe it was the president of Bank of

7 America, but I'm not hundred percent sure, sir. It was

8 one of the two.

9    Q. Did you have any response to that?

10    A. Yes, sir. I said I will talk to my attorneys,

11 but I am not going to resign.

12    Q. Now, when the word "you" was used in that

13 sentence, as in you have 48 hours to resign, were they

14 talking -- did you understand that to be directed at you

15 personally or at Spring Hill Radiology, or what?

16    A. I understand it was Spring Hill Radiology, and

17 I was not sure because they were talking to me, so it

18 could have been both.

19    Q. And did you ask why?

20    A. I told them, sir, there is -- I have done

21 absolutely nothing wrong and there is no reason for me

22 to resign.

23    Q. So you told them you would not resign?

24    A. I said no, sir, I don't intend to resign, but

25 I will talk to my attorneys.

Page 24

1    Q. Do you recall anything else that was said at

2 that meeting?

3    A. That they would make my life miserable if I

4 didn't resign.

5    Q. Who said that?

6    A. One of the board members, sir.

7    Q. You don't recall which one?

8    A. No, sir. I think it was the Bank of America

9 president or it could have been the reverend, but I'm

10 not sure, sir.

11    Q. But you never asked why they were making these

12 statements?

13    A. No, sir. They were saying something to the

14 effect that they have reviewed the ad hoc committee

15 reports or findings or something, and based on that,

16 they were deciding that they were not going to renew.

17 They wanted me to resign.

18    Q. Based on that last answer, it sounds like this

19 meeting was in some way connected with peer review and

20 so I will cease asking questions about it and I will --

21 I am now moving to strike all testimony relating to this

22 meeting.

23     When you took the draft contract to your

24 attorney, you said you got points from him. What do you

25 mean by that?

6

01

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

TAMPA DIVISION

CASE NO. 8:05-CV-27-T24-TGW

DILIP MEHTA, M.D.,

                    Plaintiff,

vs.

HCA HEALTH SERVICES OF FLORIDA, INC.

d/b/a HCA OAK HILL HOSPITAL,

                   Defendants.

_____)

− − −

VIDEO DEPOSITION OF MICKEY SMITH

− − −

June 2, 2006

JOY HAYES & ASSOCIATES

OFFICIAL COURT REPORTERS

SERVING CITRUS, HERNANDO & SUMTER COUNTIES

111 West Main Street

Inverness, Florida 34450

BUS (352) 726-4451

02

PROCEEDINGS:     Deposition of MICKEY SMITH

DATE:            June 2, 2006

TIME:            10:15 - 3:40 p.m.

LOCATION:       OAK HILL HOSPITAL

                 11375 Cortez Boulevard

                 State Road 50

                 Spring Hill, Florida 34611

REPORTED BY:     S. Elaine Kaiser, RPR

                 Court Reporter and Notary Public

                 State of Florida at Large.

APPEARANCES

COHEN, JAYSON & FOSTER, P.A.

201 East Kennedy Boulevard, Suite 1000

Tampa, Florida 33602

Attorneys for Plaintiff

BY:  KEVIN DARKEN, ESQ.

     TODD FOSTER, ESQ.

CARLTON FIELDS, P.A.

Corporate Center 3

4221 W. Boyscout Boulevard

Tampa, Florida 33607-3239

Attorneys for Defendant

BY:  DONALD SCHMIDT, ESQ.

Also present:

  Dilip Mehta, M.D.

  Dave Clunn, Video Technician

---

23
24
25

0003

1                  I N D E X

2   WITNESS:

3   MICKEY SMITH

4     Direct Examination              5

5   EXHIBIT:

6     Plaintiff's Exhibit No. 1       18

      Plaintiff's Exhibit No. 2       25

7     Plaintiff's Exhibit No. 3       27

      Plaintiff's Exhibit No. 4       37

8     Plaintiff's Exhibit No. 5       42

      Plaintiff's Exhibit No. 6       46

9     Plaintiff's Exhibit No. 7       56

      Plaintiff's Exhibit No. 8       68

10    Plaintiff's Exhibit No. 9       94

      Plaintiff's Exhibit No. 10    106

11    Plaintiff's Exhibit No. 11    162

12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

0004

1       VIDEO TECHNICIAN:  Time on the video record

2   is 10:15 a.m.  My name is David Clunn, certified

3   video specialist in association with John

4   LuBrant Court Video, P.O. Box 140870,

5   Gainesville, Florida 37614.

6       I'm here today, June 2nd, 2006, at Oak

7   Hill Hospital, 11375 Cortez Boulevard, Spring

8   Hill, Florida, to video the deposition of

9   Mickey Smith in the case of Dilip Mehta, M.D.

10  versus HCA Health Services of Florida, Inc.,

11  d/b/a HCA Oak Hill Hospital, Case No.

12  805CB27T24TGW, filed in District Court, Middle

13  District of Florida.

14      The court reporter is Elaine Kaiser

15  from Joy Hayes and Associates, Court Reporters.

16  P.O. Box 5082, Inverness, Florida 34450.

17      Will counsel please introduce

18  themselves beginning with plaintiff's counsel.

19     MR. DARKEN:  Kevin Darken for Dr. Mehta.

20     MR. FOSTER:  I'm Todd Foster also for

21  Dr. Mehta.

22     MR. SCHMIDT:  Don Schmidt for the

23  defendant.

24     VIDEO TECHNICIAN:  Will the court reporter

25  please swear the witness.



JUNE 2, 2006

Page 81

(1) **A** Not that I recall.

(2) **Q** Okay. Have you ever had a similar
(3) circumstance in which all physician members of the
(4) physician – of the board of hospital trustees
(5) recused themselves?

(6) **A** Not that I recall.

(7) **Q** When you spoke to Dr. Mehta and told him to
(8) come to this meeting, what did you tell him?

(9) **A** I don't recall the specifics.

(10) **Q** You told him when the meeting would be?

(11) **A** Yes.

(12) **Q** You told him where it would be?

(13) **A** Yes.

(14) **Q** Did you tell him what the subject of the
(15) meeting would be?

(16) **A** I'm sure I told him that the board would
(17) like to meet with him.

(18) **Q** Did you tell him why the board would like
(19) to meet with him?

(20) **A** I don't recall.

(21) **Q** Now, in this meeting on December 15, 2003,
(22) who was present?

(23) **A** The lay board members, Don and myself.

(24) **Q** Don being Mr. Schmidt?

(25) **A** Yes.

Page 82

(1) **Q** And who were the lay board members?

(2) **A** Reverend Okopski, John Ellenbeck, Ernie
(3) Holsauer?

(4) **Q** Who is Ernie Holsauer?

(5) **A** He is the – he works for Withlacoochee
(6) Electric.

(7) **Q** Does he still work there?

(8) **A** Yes.

(9) **Q** And Mr. Ellenbeck worked for Bank of
(10) America; is that correct?

(11) **A** Yes.

(12) **Q** Does he still work at Bank of America?

(13) **A** Yes.

(14) **Q** And Mr. Okopski is a minister?

(15) **A** Yes.

(16) **Q** And where does he work?

(17) **A** Grace Presbyterian.

(18) **Q** Did Dr. Mehta bring anyone with him to this
(19) meeting?

(20) **A** No.

(21) **Q** Where was the meeting held?

(22) **A** I believe it was in our board room.

(23) **Q** Do you remember when the meeting was?

(24) **A** No.

(25) **Q** So when Dr. Mehta arrived at the meeting,

Page 83

(1) what happened?

(2) **A** He came in and the board members had a
(3) discussion with him.

(4) **Q** Okay. What was said at that meeting?

(5) **A** Basically the board wanted to give him the
(6) opportunity to resign before the proceedings reached
(7) the point where it would be a reportable event.

(8) **Q** Okay. So who said – who presented that to
(9) Dr. Mehta?

(10) **A** I don't recall.

(11) **Q** All right. Did you or was it one of the
(12) board members?

(13) **A** It was the board members.

(14) **Q** How much time was Dr. Mehta given to
(15) resign?

(16) **A** I don't recall.

(17) MR. SCHMIDT: Object to the form.

(18) BY MR. DARKEN:

(19) **Q** Okay. Was he given an amount of time in
(20) which to resign?

(21) **A** I'm sure he was.

(22) **Q** You don't remember that?

(23) **A** I don't recall. It would have been based
(24) on the timing of the peer review process.

(25) **Q** What was he told would be the benefit of

Page 84

(1) resigning?

(2) **A** Avoiding the chance of a reportable event.

(3) **Q** And how was that explained to him? How
(4) would he avoid a reportable event?

(5) **A** If he resigned.

(6) **Q** Why would he have avoided a reportable
(7) event if he had resigned?

(8) **A** Because he would have been off the staff
(9) and the peer review wouldn't have completed.

(10) **Q** Okay. So there would not have been a final
(11) result from the peer review process if he had
(12) resigned?

(13) **A** Yes.

(14) **Q** And that was explained, that point was
(15) explained to him?

(16) **A** Yes.

(17) **Q** Did Dr. Mehta agree to resign?

(18) **A** No.

(19) **Q** What was Dr. Mehta told would happen if he
(20) did not resign?

(21) **A** That the peer review process would
(22) continue.

(23) **Q** And what was he told about the future steps
(24) in the peer review process?

(25) **A** I don't recall the specifics.

Page 21

Page 85

(1) Q Was he told anything regarding other
(2) witnesses who might testify against him?
(3) A I don't recall specifically.
(4) Q Was he told anything about other women who
(5) might be called as witnesses against him?
(6) A I'm sure we shared all the information with
(7) him that we had so he could make the best decision
(8) for himself.
(9) Q And what do you recall sharing with
(10) Dr. Mehta?
(11) A I think the board members were the ones
(12) that had the discussion.
(13) Q Okay.  What do you remember about what the
(14) board members shared with Dr. Mehta?
(15) A Just the process and that there would be
(16) witnesses.
(17) Q Did the board members name the women who
(18) would be witnesses?
(19) A I don't recall.  I'm sure they would have.
(20) Q Did the board members list the number of
(21) women who would be witnesses?
(22) A I don't recall specifically.
(23) Q Did the board members describe what those
(24) women — what they said those women would testify to?
(25) A If — to the extent that they knew.

Page 86

(1) Q Okay.  What did they say to Dr. Mehta about
(2) that?
(3) A I don't recall specifically.
(4) Q What do you recall generally about that?
(5) MR. SCHMIDT:  I'm going to cut this off.
(6) MR. DARKEN:  On what grounds?
(7) MR. SCHMIDT:  We're getting into specific
(8) peer review testimony here.  And which again has
(9) no — you haven't connected it up at all with
(10) the decision on the contract.  So I have let you
(11) get into this meeting but the details of any
(12) specific peer review witness testimony is simply
(13) not part of this case and not relevant to the
(14) case, so it's not proper.
(15) MR. DARKEN:  With respect, I think it is
(16) proper.  I think it's totally relevant and, you
(17) know, I don't think you get to decide what's
(18) relevant.
(19) You know the parameters of discovery
(20) are quite broad, as you know, and all I'm asking
(21) is about what was said to Dr. Mehta.  And it's
(22) been described generally that he was told that
(23) there were other women who were going to testify
(24) against him, and all I'm asking is what
(25) specifics, to the extent this witness can

Page 87

(1) remember, he was given in an effort to persuade
(2) him to resign from the staff at a time when the
(3) hospital says it still wanted to renew the
(4) contract.
(5) MR. SCHMIDT:  Why don't you ask him whether
(6) he remembers any specifics and maybe we'll avoid
(7) a confrontation that way.
(8) MR. DARKEN:  Well, what specifics do you
(9) remember Dr. Mehta being told about these women?
(10) MR. SCHMIDT:  I'm going to direct him not
(11) to answer that question.  If you want to ask him
(12) does he remember any specifics, then you can go
(13) to your second question if he remembers any.
(14) MR. DARKEN:  Well, what specifics do you
(15) remember?  Do you remember any specifics?
(16) MR. SCHMIDT:  Thank you.
(17) THE WITNESS:  No.
(18) BY MR. DARKEN:
(19) Q You don't remember any names?
(20) A No.
(21) Q Do you remember whether they were current
(22) employees?
(23) A Some were not.
(24) Q Do you remember whether there were any
(25) current employees?

Page 88

(1) A No.
(2) Q The ones you remember were not current
(3) employees?
(4) A Yes.
(5) Q But you don't remember their names?
(6) A No.
(7) Q You don't remember how many there were?
(8) A No.
(9) Q Now, the draft contract that you -- the
(10) draft contract that you -- the draft contract that
(11) the hospital had out to Spring Hill Radiology
(12) required the participation of Dr. Mehta, right?
(13) A Let me look.
(14) Q Look at Exhibit — I think it's No. 4.
(15) Didn't it require the specific participation of
(16) Dr. Mehta, Dr. Madera, and Dr. Wasserman?
(17) A Yes.
(18) Q So your testimony is that you're at a
(19) meeting on December 15, 2003, and the board of
(20) trustees of the hospital is offering Dr. Mehta the
(21) opportunity to resign at the same time that the
(22) hospital was hoping to renew it's contract with
(23) Spring Hill Radiology, which specifically calls for
(24) Dr. Mehta to be one of the principals of Spring Hill
(25) Radiology; is that correct?

JUNE 2, 2006

Page 89

(1) **A** It does but it also allows any of those
(2) three individuals to be excused.
(3) **Q** Well, let me ask you this: Did you ever
(4) tell Dr. Mehta at any point in December 2003 that the
(5) hospital wanted to renew it's contract with Spring
(6) Hill Radiology but did not want him working at Spring
(7) Hill Radiology?
(8) **A** I don't recall ever saying that.
(9) **Q** Okay. You had never heard Tom Edwards say
(10) that either, did you?
(11) **A** I did not hear Tom say that.
(12) **Q** So Dr. Mehta was given a period of time to
(13) respond. Was it forty-eight hours?
(14) **A** I — I don't recall.
(15) **Q** Who gave him the period of time, you or one
(16) of the board members?
(17) **A** My recollection was the board members did
(18) all the talking.
(19) **Q** Did you say anything?
(20) **A** Not that I recall.
(21) **Q** And Dr. Mehta said he did not want to
(22) resign?
(23) **A** Yes.
(24) **Q** Did you tell the hospital board of trustees
(25) that the hospital was engaged at that time in

Page 90

(1) negotiating a contract extension with Spring Hill
(2) Radiology?
(3) **A** They were aware from the October board
(4) meeting that we were trying to work things out.
(5) **Q** All right. Did you tell them at the — at
(6) this December 15 partial board meeting, did you tell
(7) the lay members of the hospital board of trustees
(8) that the hospital was continuing to negotiate with
(9) Spring Hill Radiology?
(10) **A** I don't recall stating that.
(11) **Q** Nobody asked that?
(12) **A** No.
(13) **Q** Did you tell the lay members of the board
(14) of trustees that you were negotiating with another
(15) group, the Perisi group, in lieu of Spring Hill
(16) Radiology?
(17) **A** I would have at some point in time. I
(18) don't recall when.
(19) **Q** Well, specifically I'm focusing on
(20) December 15th.
(21) **A** No.
(22) **Q** So as of December 15, 2003, the lay members
(23) of the hospital board who attended the December 15th
(24) meeting that you testified about, had they ever heard
(25) of Radiology Doctors P.A.?

Page 91

(1) **A** I don't believe so.
(2) **Q** They had never been informed that Radiology
(3) Doctors P.A. might be — might become the radiology
(4) group at Spring — at Oak Hill Hospital?
(5) **A** I don't believe so.
(6) **Q** So, your position is that even after the
(7) December 15 meeting the hospital still wanted to
(8) renew the contract with Spring Hill Radiology?
(9) **A** Yes.
(10) **Q** Even though at that point — back up a
(11) step. In the meeting on December 15 you advised, not
(12) you, the board as a whole, advised Dr. Mehta that if
(13) he didn't accept this opportunity, in quotes, to
(14) resign that there was a possibility that there would
(15) be a reportable event reported against him in the
(16) national practitioner data bank, correct?
(17) **A** Yes.
(18) **Q** That would have been — if that had
(19) occurred, could he still have continued to function
(20) at Spring Hill Radiology, I mean, at Oak Hill
(21) Hospital?
(22) **A** I — it depends on what the decision of the
(23) ad hoc committee was, whether it affected his — how
(24) it affected his privileges.
(25) **Q** All right. So it would depend on how the

Page 92

(1) process played out?
(2) **A** Yes.
(3) **Q** So despite the fact that the board told
(4) Dr. Mehta that there was a risk that there would be a
(5) reportable event recorded against him at the national
(6) practitioner data bank, the hospital continued to
(7) want to enter into the renewal contract?
(8) **A** Yes.
(9) **Q** Now, the national practitioner data bank,
(10) that's open to the public, right?
(11) **A** Yes.
(12) **Q** Anyone — any patient or potential
(13) patient —
(14) MR. SCHMIDT: Object to the form. Calls
(15) for a legal conclusion.
(16) BY MR. DARKEN:
(17) **Q** Whatever. The national practitioner data
(18) bank, anybody in Hernando County can get on the
(19) Internet and check out any doctor at the hospital,
(20) right?
(21) MR. SCHMIDT: Object to the form.
(22) THE WITNESS: Yes.
(23) BY MR. DARKEN:
(24) **Q** Would that be a good thing for the hospital
(25) to have a hospital-based physician who is the head of

IN THE CIRCUIT COURT OF THE FIFTH JUDICIAL CIRCUIT
IN AND FOR HERNANDO COUNTY, FLORIDA

KARYN FLATAU,

      Plaintiff,

vs.                   CASE NO. H27-CA-2003-1285-DM

DILIP MEHTA, M.D.,

      Respondent.



_____/

**VIDEOTAPED DEPOSITION OF DILIP MEHTA, M.D.**
**VOLUME I**

TAKEN:              Pursuant to Notice by
                       Counsel for Plaintiff

DATE:              September 16, 2005

TIME:              9:17 a.m. - 12:33 p.m.

LOCATION:         Maxa Enterprises, Inc.
                       d/b/a Deborah Kurtz & Associates
                       1275 Cleveland Street
                       Clearwater, FL  33755

REPORTER:         Debra S. Turner
                       Registered Diplomate Reporter
                       Notary Public
                       State of Florida at Large

---

**MAXA ENTERPRISES, INC.**
**d/b/a Deborah Kurtz & Associates**
**1275 Cleveland Street**
**Clearwater, Florida  33755**
**(727) 441-2404    Fax:  (727) 448-0028**

1    allegations?

2       **A**    No, sir.  Mickey Smith just told me -- he came by

3    when he gave me the letter.  He said, The committees found no

4    evidence of wrongdoing, and the hospital has decided that its

5    not going to renew your contract -- continue the contract

6    after February 29, 2004, and that's it.

7       **Q**    That was the -- the termination would have been

8    February 2004?  The termination date of your contract.

9       **A**    That was the extension, and he said he was not going

10   to continue beyond that point.

11      **Q**    And anything else happened after he advised you it

12   was not going to be extended?

13      **A**    No, sir.  I don't recollect anything happening.

14      **Q**    Did you file any other complaints with any

15   governmental agency or did you file any complaints with any

16   governmental agencies concerning Doctor Flatau?

17         **MR. DARKEN:**  Concerning Doctor Flatau or the

18      hospital?

19         **MR. SNOW:**  Doctor Flatau specifically.

20         **THE DEPONENT:**  No, sir.

21      **Q**    (By Mr. Snow)  You didn't file a complaint with any

22   state agency -- well, I already asked that.  You said, No.

23   Did you file any complaints concerning the hospital?

24      **A**    Yes, sir.

25      **Q**    And I'm not talking about lawsuits.  I'm talking